**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| [UNDER SEAL] | : | CIVIL ACTION NO.:  9:14-CV-3699-RMG |
| | : | HON. RICHARD M. GERGEL |
| Plaintiffs | : | |
| | : | |
| v. | : | FILED IN CAMERA AND |
| | : | UNDER SEAL PURSUANT |
| | : | TO 31 U.S.C. § 3730(b)(2) |
| | : | |
| [UNDER SEAL] | : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : | |

<u>SEVERED THIRD AMENDED QUI TAM COMPLAINT</u>

# MATTER FILED UNDER SEAL

# DO NOT FILE WITH PACER

# DO NOT SERVE ON DEFENDANT

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................. 1

II.    JURISDICTION AND VENUE ............................................................ 5

III.   PROCEDURAL HISTORY .................................................................. 7

IV.    THE PARTIES...................................................................................... 8

    A.     Relators Lutz and Webster ....................................................... 8

    B.     Defendant Laboratory Corporation of America Holdings ("LabCorp")...... 10

V.     Third-Parties HDL and Singulex ...................................................... 11

    A.     Health Diagnostic Laboratory, Inc. ("HDL") ....................... 11

        1.     HDL Testing for Risk Factors for Cardiovascular Disease.................... 12

    B.     Singulex, Inc. ("Singulex") ...................................................... 15

VI.    BACKGROUND ON FEDERAL AND STATE HEALTH CARE PROGRAMS..... 16

    A.     The Medicare Program ............................................................ 16

        1.     Medicare Payments: Only Medically Necessary Services ....................... 16

        2.     Medicare Only Pays for Medically Necessary Clinical Laboratory Testing ........ 19

        3.     The Independent Laboratory Bills Medicare for Testing Services ........ 20

        4.     Limits on Medicare Payments for Blood Draws (Venipuncture) ........... 22

        a.     Medicare Pays for Blood Draws (Venipuncture) by a Physician............ 23

        b.     Medicare Pays for Blood Draws (Venipuncture) by a Clinical Laboratory ..... 23

    B.     The Medicaid Program............................................................. 24

        1.     Medicaid Programs Pay for Necessary Clinical Laboratory Testing.... 25

        2.     Medicaid Coverage for Blood Draws (Venipuncture) ............................. 25

    C.     Other Government-Funded Health Care Programs Pay for Laboratory Tests ........ 26

        1.     TRICARE/CHAMPUS and other Federal Healthcare Benefits............. 26

        2.     Other State-Funded Healthcare Programs................................. 27

        3.     Private Insurance Pays for Medically Necessary Laboratory Tests....... 28

VII.   THE APPLICABLE LAW.................................................................... 28

A.  The Federal False Claims Act – Overview ....................................... 28

B.  The Federal Anti-Kickback Statute ................................................. 29

C.  Claims for Lab Tests Tainted by AKS Violations Are Fraudulent ............... 31

    1.  HHS-OIG: Fraud Alert on Lab Services and Tainted Referrals ........... 31

D.  State False Claims Acts ("State FCAs") .......................................... 33

VIII. ALLEGATIONS: DEFENDANT LABCORP, AND CO-CONSPIRATORS HDL
    AND SINGULEX, PROVIDE ILLEGAL INDUCEMENTS FOR PATIENT
    REFERRALS FOR LABORATORY TESTS ................................................. 36

A.  Overview of HDL and Singulex Operations ....................................... 36

B.  Relators Discover HDL and Singulex Payments to Dr. Miller
    for Referrals ........................................................................ 36

    1.  Lloyd Miller, MD ................................................................. 37

C.  BlueWave & HDL Lure Physicians with "Processing" Fees .......................... 37

    1.  BlueWave and HDL Redirect Dr. Miller's Referrals to HDL ............... 37

    a.  "Berkley" is Pre-Printed on His Encounter Page ........................... 38

    b.  After Dr. Miller Abruptly Shifts to HDL, "Berkeley" Means "HDL" ... 38

    2.  HDL Pays Referring Physicians, Including Dr. Miller, Bogus
        "Processing" Fees ............................................................... 39

    3.  HDL "Processing" Arrangements with Physicians,
        Including Dr. Miller, Are Bogus ............................................... 40

    4.  Singulex's Inducements: $10 Per Referral Are Bogus
        "Processing" Fees ............................................................... 42

    5.  Singulex "Processing Services" Agreements Are False Records ........... 43

    6.  CMS Pays for Blood Draws, But Not  "Processing" Services ............... 45

    7.  HDL and Singulex Arrangements with Dr. Miller Violate AKS ............ 48

D.  Defendant LabCorp Gives Dr. Miller Free Lab Services for Referrals ........ 49

    1.  HDL, Singulex, and LabCorp .................................................... 50

    2.  LabCorp's Free "Processing" Services for HDL and Singulex Tests..... 52

    3.  LabCorp Demands A Fee If Dr. Miller Does Not Refer To LabCorp.... 52

    4.  LabCorp's Inducement to Dr. Miller Causes Unnecessary
        (Duplicative) Testing ......................................................... 54

    5.  LabCorp Knows Its Tests Are Duplicative ................................... 55

E.  LabCorp's Free Services Facilitate the HDL and Singulex Fraud ............... 56

    F.    **HDL, Singulex, and LabCorp Offer Significant Remuneration (In Cash and In Kind) to Physicians for Referrals** ............................................ 56

        1.    **HDL Kickbacks: $130,000-Plus** ................................................ 57

        2.    **Singulex Kickbacks: $55,000-Plus** ............................................ 57

        3.    **LabCorp Kickbacks: Full Time Phlebotomist Salary** .............................. 58

    G.    **HDL, Singulex and BlueWave National Scheme: Inducing Referrals for Lab Tests** ............................................................ 58

        1.    **BlueWave's Founders Deliver the HDL and Singulex Promotions: Fees for Patient Referrals** ............................................ 58

        a.    **The National Scope of HDL's Scheme** .................................... 58

        b.    **HDL Induced Physicians to Switch Overnight** ............................ 60

    H.    **BlueWave Delivers Singulex Offers of "Processing Fees"** .............. 61

        1.    **BlueWave and HDL Grab Physician Referrals in Many States** ............ 61

        a.    **BlueWave Markets Singulex Inducements in Many States** .................... 63

        2.    **False Records to Get False or Fraudulent Claims Paid: Singulex and HDL "Processing" Agreements with Referring Physicians** .................... 65

        3.    **National Scope of Independent Lab Inducements for Referrals** ........... 67

        4.    **LabCorp's, HDL's, and Singulex's Illegal Inducements Expose Patients to Harm** ........................................................ 70

        a.    **Physical Harm Caused by Tainted Laboratory Tests** ............................ 70

        b.    **Tainted Laboratory Tests Cause Economic Harm to Patients** .............. 71

IX.    **The LabCorp, HDL, and Singulex Scheme Causes Government Healthcare Programs to Pay Millions of Dollars for Unnecessary, Useless, and Even Harmful Clinical Laboratory Testing** ............................................................ 72

    A.    **The Scheme to Submit or Cause the Submission of False Claims** ................ 72

    B.    **Damages to Government Healthcare Programs: Millions in Reimbursements** ............................................................ 75

        1.    **HDL Claims Average $1,400_Per Beneficiary, 3-4 Times a Year** .......... 76

        2.    **Singulex Reimbursements Average $300 Per Beneficiary Per Episode** ............................................................ 77

        3.    **LabCorp Reimbursements** ............................................ 77

**COUNT I (UNITED STATES EX REL. LUTZ AND WEBSTER V LABCORP) Violation of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A), (B) and (C)** ................ 81

**COUNT II (UNITED STATES EX REL. LUTZ AND WEBSTER V LABCORP)**
**Violations of the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(G)** ...................... 83

**COUNT III (NORTH CAROLINA EX REL. LUTZ AND WEBSTER V LABCORP)**
**NORTH CAROLINA FALSE CLAIMS ACT N.C. Gen. Stat. § 1-605** *et seq.* ......... 85

**COUNT IV (CALIFORNIA EX REL. LUTZ AND WEBSTER V LABCORP)**
**CALIFORNIA FALSE CLAIMS ACT Cal. Govt Code §§ 12650** *et seq.* .................. 86

**COUNT V (CALIFORNIA, EX REL. LUTZ AND WEBSTER V LABCORP)**
**CALIFORNIA INSURANCE FRAUDS PREVENTION ACT**
**Cal. Ins. Code § 1871.7** ..................................................................................... 88

**COUNT VI (COLORADO EX REL. LUTZ AND WEBSTER V LABCORP)**
**COLORADO MEDICAID FALSE CLAIMS ACT**
**Colo. Rev. Stat. Ann. §§ 25.5-4-303.5** *et seq.* ............................................. 90

**COUNT VII (DELAWARE EX REL. LUTZ AND WEBSTER V LABCORP)**
**DELAWARE FALSE CLAIMS AND REPORTING ACT**
**Del. Code Ann. tit. 6, §§ 1201** *et seq.* ......................................................... 92

**COUNT VIII (FLORIDA EX REL. LUTZ AND WEBSTER  V LABCORP)**
**FLORIDA FALSE CLAIMS ACT Fla. Stat. Ann. §§ 68.081** *et seq.* ........................... 94

**COUNT IX (GEORGIA EX REL. LUTZ AND WEBSTER V LABCORP)**
**GEORGIA STATE FALSE MEDICAID CLAIMS ACT**
**Ga. Code Ann. §§ 49-4-168** *et seq.* ............................................................. 95

**COUNT X (ILLINOIS EX REL. LUTZ AND WEBSTER V LABCORP)**
**ILLINOIS FALSE CLAIMS ACT 740 Ill. Comp. Stat. Ann. §§ 175/1** *et seq.* .......... 97

**COUNT XI (ILLINOIS EX REL. LUTZ AND WEBSTER V LABCORP)**
**ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT**
**740 Ill. Comp. Stat. § 92/1,** *et seq.* ............................................................. 99

**COUNT XII (INDIANA EX REL. LUTZ AND WEBSTER V LABCORP)**
**INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**
**Ind. Code §§ 5-11-5.5-1** *et seq.* ................................................................. 101

**COUNT XIII (IOWA EX REL. LUTZ AND WEBSTER V LABCORP)**
**IOWA FALSE CLAIMS ACT Iowa Code Ann. §§ 685.1** *et seq.* .............................. 103

**COUNT XIV (LOUISIANA EX REL. LUTZ AND WEBSTER V LABCORP)**
**LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW**
**La. Rev. Stat. Ann. §§ 46:437.1** *et seq.* ..................................................... 104

**COUNT XV (MICHIGAN EX REL. LUTZ AND WEBSTER V LABCORP)**
**MICHIGAN MEDICAID FALSE CLAIMS ACT**
**Mich. Comp. Laws §§ 400.601 through 400.615** ........................................... 106

**COUNT XVI (MINNESOTA EX REL. LUTZ AND WEBSTER V LABCORP)**
**MINNESOTA FALSE CLAIMS ACT Minn. Stat. Ann. §§ 15C.01** *et seq.* ............. 108

iv

**COUNT XVII (NEW JERSEY EX REL. LUTZ AND WEBSTER V LABCORP)**
**NEW JERSEY FALSE CLAIMS ACT**
**N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*** ............................................................... 110

**COUNT XVIII (NEW YORK EX REL. LUTZ AND WEBSTER V LABCORP)**
**NEW YORK FALSE CLAIMS ACT N.Y. State Fin. Law §§ 187 *et seq.*** ................ 112

**COUNT XIX (TENNESSEE EX REL. LUTZ AND WEBSTER V LABCORP)**
**TENNESSEE MEDICAID FALSE CLAIMS ACT**
**Tenn. Code Ann. §§ 71-5-181 *et seq.*** .............................................................. 113

**COUNT XX (TEXAS EX REL. LUTZ AND WEBSTER V LABCORP)**
**TEXAS MEDICAID FRAUD PREVENTION ACT**
**Tex. Hum. Res. Code §§ 36.001 *et seq.*** ......................................................... 115

**COUNT XXI (VIRGINIA EX REL. LUTZ AND WEBSTER V LABCORP)**
**VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**Va. Code Ann. §§ 8.01-216.1 *et seq.*** .............................................................. 117

**COUNT XXII (WISCONSIN EX REL. LUTZ AND WEBSTER V LABCORP)**
**WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT**
**Wis. Stat. §§ 20.931 *et seq.*** ............................................................................ 119

**DEMAND FOR JURY TRIAL** ............................................................................... 121

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | : | |
| THE STATES OF NORTH CAROLINA, | : | |
| CALIFORNIA, COLORADO, DELAWARE, | : | CA NO.: 9:14-CV-3699-RMG |
| FLORIDA,GEORGIA, ILLINOIS, INDIANA, | : | HON. RICHARD M. GERGEL |
| IOWA, LOUISIANA, MICHIGAN, | : | |
| MINNESOTA, NEW JERSEY, NEW YORK, | : | |
| TENNESSEE, TEXAS, VIRGINIA and | : | |
| WISCONSIN , EX REL. SCARLETT LUTZ | : | SEVERED THIRD AMENDED |
| and KAYLA WEBSTER, | : | QUI TAM COMPLAINT |
| | : | |
| Plaintiffs/Relators, | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | **FILED IN CAMERA AND** |
| LABORATORY CORPORATION OF | : | **UNDER SEAL PURSUANT** |
| AMERICA HOLDINGS | : | **TO 31 U.S.C. § 3730(b)(2)** |
| | : | |
| Defendant. | : | |
| | : | |

_____

I.    <u>**INTRODUCTION**</u>

This *qui tam* action alleges violations of the federal False Claims Act, 31 U.S.C. § 3729,

*et seq.*, and analogous state False Claims Acts, related to a clinical laboratory testing scheme

carried out by Defendant Laboratory Corporation of America Holdings ("LabCorp").  Defendant

LabCorp provided illegal financial inducements to physicians in exchange for referrals of

patients for a variety of laboratory testing.  Defendant LabCorp's financial relationships with

referring physicians violate federal and state anti-kickback statutes.  Defendant LabCorp also

conspired with third-parties Health Diagnostic Laboratory, Inc. ("HDL") and Singulex, Inc.

("Singulex") to violate the federal False Claims Act and the analogous state False Claims Acts

by facilitating HDL's and Singulex's offers of illegal inducements to physicians and the referral of patients by physicians to HDL and Singulex labs.  Relators also allege violations by LabCorp of the California Insurance Frauds Prevention Act ("CIFPA"), Cal. Ins. Code § 1871, *et seq*; and the Illinois Insurance Claims Fraud Prevention Act ("ILCFPA"), 740 Ill. Comp. Stat. § 92/1, *et seq*.

Qui Tam Plaintiffs ("Relators") Lutz and Webster, through their legal counsel, William J. Tuck, P.A., Pietragallo Gordon Alfano Bosick & Raspanti, LLP, and Wyatt & Blake, L.L.P., bring this action on their own behalf, and on behalf of the United States of America and the States of North Carolina, California Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin   (hereafter "the Government").   These States, along with the United States, are hereafter collectively referred to as the "Government."

1.    This is an action to recover monetary damages and civil penalties on behalf of the United States of America and the States of North Carolina, California,  Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin, arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used, or presented by Defendant LabCorp and third-parties HDL and Singulex, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq*., as amended ("the federal FCA"). This action also arises under the false claims acts of the States of North Carolina, California, . Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin.  This action also arises under the CIFPA and ILCFPA, private insurance *qui tam* statutes in the States of California and Illinois, respectively.

2

2.      Defendant LabCorp, and third-parties HDL and Singulex, are nationwide providers of clinical laboratory testing services. Many of the patients receiving their services are beneficiaries of myriad Government programs, including, but not limited to, the Medicare, TRICARE/CHAMPUS, and numerous Medicaid programs and other state funded healthcare programs.   A significant number of patients receiving these services are insured by myriad private insurers, including patients who are residents of California and/or Illinois. The unlawful scheme is wide reaching but straightforward.   HDL and Singulex offer cash remuneration to physicians to induce them to refer patients to HDL and Singulex for laboratory testing related to high cholesterol and predicting risk factors for coronary disease.   HDL offers physicians $20.00 per patient referral.   Singulex offers physicians $10.00 for each patient referred.   Both HDL and Singulex attempt to disguise these illegal remunerations through sham "processing fee" arrangements with referring physicians.   A physician who refers a patient to both HDL and Singulex receives a total of $30.00 in "processing fees" each time the patient is tested.

3.      Defendant LabCorp participates in the fraudulent scheme by providing free blood draw and processing services to physicians for patients referred to HDL and Singulex. In particular, LabCorp technicians provide these referring physicians with free services: drawing blood from patients, processing it, and packaging individual blood samples in preparation for shipment.   In exchange for LabCorp performing these free blood drawing and processing services, physicians who receive kickbacks from HDL and Singulex also order tests from LabCorp.   Many of these LabCorp tests are medically unnecessary and even duplicative of HDL tests.

4.      Physicians have referred and continue to refer patients to HDL, Singulex, and LabCorp in exchange for these inducements.

3

5.     One purpose of the inducements offered by Defendant LabCorp, HDL, and Singulex is to obtain referrals from targeted physicians. Therefore, all claims submitted to Government healthcare programs or to private insurers in California and Illinois by HDL, Singulex, and LabCorp that are tainted by the fraudulent kickback scheme are false claims.

6.     Defendant LabCorp and third-parties HDL and Singulex violate the federal FCA by submitting or causing the submission of false claims for laboratory testing tainted by their fraudulent conduct, and by creating false or fraudulent records material to false claims.

7.     Defendant LabCorp and third-parties HDL and Singulex have further violated the FCAs of the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin in the same manner they violated the federal FCA.

8.     In addition, Defendant LabCorp has violated federal and state FCAs by conspiring with HDL and Singulex to submit and/or to cause the submission of false claims by HDL and Singulex for these illegally induced laboratory tests to state healthcare programs, including Medicaid, and by conspiring to create and/or use false records material to the false or fraudulent claims for laboratory testing services submitted by Defendant LabCorp and third-parties HDL and Singulex to state health care programs, including Medicaid.

9.     Having submitted, and/or caused the submission of, these false claims to federal and state health care programs, Defendant LabCorp violated the federal and state FCAs by failing to return to state and federal government healthcare programs overpayments associated with illegally obtained state and federal funds.

10.     The national scheme of LabCorp, HDL, and Singulex caused further damage to Government healthcare programs, in addition to the reimbursements for the illegally induced,

4

and in many cases, medically unnecessary tests themselves. This scheme caused beneficiaries of Government healthcare programs and private insurance plans in California and Illinois to receive other unnecessary healthcare, including follow-up physician visits, follow-up testing, and unnecessary medications related to the illegal referrals to LabCorp, HDL, and Singulex.

11.     Defendant LabCorp's kickback scheme also violates Section 1871.7(a) of the CIFPA, Cal. Ins. Code 1871.7(a), and Section 92/5(a) of the ILCFPA 740 Ill. Comp. Stat. § 92/5(a), because LabCorp entered into illegal arrangements with physicians that provide financial incentives for the use of their laboratory services, resulting in medically unnecessary testing that is then billed to private insurers.

12.     LabCorp's, HDL's, and Singulex's operations extend across the United States, and their kickback scheme is national in scope.

13.     Relators have observed the scheme employed by LabCorp, HDL, and Singulex operating in the office of Lloyd Miller, MD, a customer of HDL, Singulex, and LabCorp.

## II.     JURISDICTION AND VENUE

14.     This action arises under the laws of the United States of America to redress violations of the federal FCA, 31 U.S.C. § 3729 *et seq.*  Defendant LabCorp does business in the District of South Carolina, the Western District of North Carolina, and throughout the United States. The acts proscribed by 31 USC § 3729(a) and described in this *qui tam* complaint occurred in the District of South Carolina, Western District of North Carolina, and elsewhere in the United States.

15.     Subject-matter jurisdiction over this *qui tam* action is conferred by 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730(b). Relator Lutz and Relator Webster are each an "original source" and otherwise authorized to maintain this action in the name of the United States and as contemplated by the Civil False Claims Act, 31 U.S.C. §§ 3729-33, and in

the name of the other named Plaintiff states.

16.    Relators have made the necessary voluntary disclosures to the Governments prior to the filing of this lawsuit and have filed all documents necessary with the United States Government as required by 31 U.S.C. § 3730(b)(2). Relators have also made all voluntary disclosures to the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin prior to the filing of this lawsuit and have filed all necessary documents with these States as required by each state's FCA and by the CIFPA and ILCFPA.

17.    The Court has jurisdiction over Defendant LabCorp's violations of the false claims statutes of the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin as well as the CIFPA and ILCFPA pursuant to 31 U.S.C. § 3732(b), because Defendant LabCorp's violations of these state acts and its violations of the federal FCA arise from the same transactions or occurrences.

18.    There has been no public disclosure of the "allegations or transactions" in this Complaint under Section 3730(e) of the federal FCA or under analogous provisions of the named state FCAs. The specific facts, circumstances, and allegations of the Defendant LabCorp's violations of the federal and state False Claims Acts and the CIFPA and ILCFPA have not been publicly disclosed in a civil suit or administrative civil money penalty proceedings in which the Government is already a party. Relators, moreover, would qualify and as and are an "original source" of the allegations in this Qui Tam Complaint under 31 U.S.C. § 3730(e) of the federal FCA, and under provisions of relevant state FCAs and the CIFPA and ILCFPA even had such a public disclosure occurred.

19.    The Court has personal jurisdiction over Defendant because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and because Defendant has minimum contacts with the United States, and can be found in, transact or have transacted, business in the District of South Carolina and the Western District of North Carolina.

20.    Defendant regularly performs healthcare services in and submits or causes the submission of thousands of claims for payment to federal and state health care programs, including, but not limited to, Medicare and Medicaid, and accordingly, are subject to the jurisdiction of this Court.

21.    Venue lies under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because the Western District of North Carolina and the District of South Carolina are districts in which Defendant can be found or transacts business, and an act proscribed by 31 U.S.C. § 3729 occurred within this district.

22.    The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the causes of action brought under the laws of the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin for the recovery of funds paid by a State Government or by a private insurer because these arise from the same facts forming the basis of the action brought under 31 U.S.C. § 3730.

## III.    **PROCEDURAL HISTORY**

23.    On February 6, 2013, Qui Tam Relators filed their Original Complaint against Defendant, under seal in the United States District Court for the Western District of North Carolina.

24.    Pursuant to this Court's Order, and the federal False Claims Act, 31 U.S.C. § 3730(b), this case has remained under seal while the United States and the named states have

investigated the allegations in Relators' Complaint.

25.     In the fall of 2013, in the midst of the various governments' investigations, the United States Department of Justice requested that Relators consent to the United States' request to transfer this matter to the District of South Carolina.

26.     Pursuant to the request by the United States, on January 24, 2014, Relators and the United States filed a joint motion to transfer this action to the District of South Carolina.

27.     On January 27, 2014, the United States District Court for the Western District of North Carolina granted the United States' and Relators' request pursuant to 28 U.S.C. § 1404(a) and entered an Order granting the motion to transfer this case, including the Complaint and all pleadings, and directing that all pleadings and matters filed remain under seal.

28.     On September 18, 2014, this Court severed the allegations against Defendant LabCorp, and directed that Relators file a Severed Second Amended Qui Tam Complaint against Defendant LabCorp. On September 26, 2014, Relators filed a Severed Second Amended Qui Tam Complaint Against Defendant LabCorp.

## IV.    THE PARTIES

### A.    Relators Lutz and Webster

29.     Qui Tam Relator Scarlett Lutz ("Relator Lutz") is an individual residing in Florence, South Carolina.

30.     Relator Lutz is the owner and operator of Palmetto Billing Services, 900 W. Evans Street, Florence, SC 29501.

31.     From March of 2011 until September of 2011, Relator Lutz provided billing services to Dr. Lloyd Miller, MD ("Dr. Miller"), a primary care physician in Florence, SC. During this time, Relator Lutz learned of Defendant's efforts to provide inducements to physicians, as well as Dr. Miller's billing practices including billings to government healthcare

programs and private insurers for patient blood draws for clinical laboratory testing.

32.    Qui Tam Relator Kayla Webster, RN ("Relator Webster") is an individual residing in Timmonsville, South Carolina.

33.    Relator Webster received a B.S. in Nursing from Francis Marion University in Florence, South Carolina in May 2008.  Since that same time, Relator has been employed as a registered nurse.

34.    Relator Webster has worked part time as a registered nurse for Comfort Keepers, a home health agency in Florence, South Carolina.  In that capacity, she performs home visits and patient assessments.

35.    Since her graduation from college until late July 2013, Relator Webster's main employment has been as the Nursing Supervisor for Dr. Miller.  In that capacity, Relator Webster has interacted with patients on a daily basis, performed clinical services, including triage, provided assistance with prescription medications, and reviewed patient lab test results (including HDL and Singulex, and LabCorp).  Relator Webster has also interacted with insurers on a variety of issues, including prior authorizations.

36.    Through her experience as Nursing Supervisor for Dr. Miller, Relator Webster has direct and independent knowledge of the LabCorp, HDL, and Singulex marketing efforts and practices. She also has knowledge of inducements offered by HDL, Singulex, and LabCorp to referring physicians, as well as Dr. Miller's practices with regard to patient referrals and patient blood draws for clinical laboratory testing.

37.    Relators have direct and independent knowledge of the factual allegations contained in this Qui Tam Complaint and each of them brings this action as an "original source," as that term is defined by the state and federal governments' false claims acts.

B.     **Defendant Laboratory Corporation of America Holdings ("LabCorp")**

38.     Defendant Laboratory Corporation of America Holdings ("LabCorp") is a Delaware for-profit corporation with a principal place of business located at 358 S. Main Street, Burlington, NC 27215.  LabCorp is a publicly traded company, which is listed on the NYSE as LH.

39.     LabCorp is the second-largest provider of clinical laboratory services in the United States, with reported net revenues in excess of $5 billion in 2010, and more than $5.5 billion in 2011. LabCorp's President and Chief Executive Officer is David P. King.

40.     LabCorp transacts business throughout the United States, including within the District of South Carolina and the Western District of North Carolina.  For example, in Charlotte, NC, Defendant LabCorp operates seven clinical testing laboratories that perform routine clinical laboratory specimen collections. In addition, LabCorp's Vice President and General Manager, Eric Feldman is located in Huntersville, NC.  Mr. Feldman, an executive sales leader with LabCorp, is a National Director of Contracts, and has been responsible for building LabCorp relationships with physicians.  LabCorp had placed a phlebotomist in Dr. Miller's office in Florence, SC.

41.     LabCorp performs testing services at various locations, including their facility in Burlington, NC, which has the NPI of 1538144910; and their Florence, SC facility, which has an NPI of 1750366753.

42.     LabCorp calls its sales representatives "Key Account Executives." According to LabCorp, Key Account Executives are "outside field representative[s]" who "educate, instruct, and up sell [sic] all assigned and newly generated accounts in a predetermined geographic territory and enable the company to maximize and maintain the volume of business these accounts may produce."  In addition, Key Account Executives provide LabCorp customers with "ongoing service and problem solving." LabCorp sales representatives retain and grow existing and new accounts and also provide ongoing customer service.

43.     LabCorp employs sales representatives to cover its Charlotte, NC territory, which includes Salisbury, Concord, Kannapolis, Rock Hill, Statesville, Shelby, Hickory, Roone, and Gastonia.

44.     LabCorp provides laboratory testing for hundreds of thousands of South Carolina and North Carolina Medicaid recipients, some of whom are dual-eligible Medicare program beneficiaries.

45.     Since at least 2000, LabCorp has served as a preferred provider for laboratory services for TRICARE beneficiaries including the TRICARE Mid-Atlantic region, which includes North Carolina.  TRICARE is the Department of Defense program that provides health care services to eligible military personnel and their families.

46.     As of 2011, LabCorp was one of the two primary laboratory service providers for Humana Military Healthcare Services, Inc. ("Humana Military"), a provider of healthcare services for service members and their families.

47.     LabCorp does business with a number of commercial insurance providers in California and Illinois, including but not limited to AETNA and Blue Cross.

## V.     Third-Parties HDL and Singulex

### A.     Health Diagnostic Laboratory, Inc. ("HDL")

48.     Health Diagnostic Laboratory, Inc. ("HDL") is a Virginia for-profit corporation with a principal place of business at 737 N. 5th Street, Suite 103, Richmond, VA 23219.  HDL is one of the leading providers in the United States of clinical laboratory testing for risk factors and biomarkers for cardiovascular and related diseases.

49.     HDL is a privately held company which was formed in November of 2008.  HDL started testing operations in November 2009. During the first quarter of 2010, HDL processed approximately 150 samples a day. By the end of 2011, HDL was running tests on about 2,700

11

samples daily.

50.     Currently, HDL serves approximately 10,000 physicians and one million patients. HDL's explosive growth is also illustrated through the size of its workforce. HDL has transitioned from just a handful of employees in 2009 to about 500 employees today.

51.     HDL transacts business in 45 states throughout the United States, including within the Western District of North Carolina and the District of South Carolina.  HDL derives a significant portion of its revenues from Medicare and Medicaid reimbursements.  Its National Provider Identifier ("NPI") is 1629209853.  HDL also derives substantial revenues from private insurers, including private healthcare insurers in California and Illinois.

### 1.     HDL Testing for Risk Factors for Cardiovascular Disease

52.     HDL claims that its clinical laboratory testing services identify factors contributing to cardiovascular disease, provide a basis for effective treatment, and allow physicians to more effectively manage their patients.  As an added value, HDL provides patients with a personalized overview of their risk factors and optional counseling from expert Health Coaches at no additional cost to the patient or their physician.

53.     The relevant tests included in HDL's  baseline testing panel, the relevant CPT codes and the Medicare reimbursement rates for  2012, are as follows:

| CPT CODE | TEST | SC MEDICARE REIMBURSEMENT RATE | NC MEDICARE REIMBURSEMENT RATE |
|---|---|---|---|
| 80061 | ApoB | $13.88 | $18.97 |
| 83876 | MPO (Myeloperoxidase) | $48.08 | $48.08 |
| 83704 | LDL-P | $44.69 | $44.69 |
| 83704 | HDL-P | - | - |
| 83700 | sdLDL | $15.95 | $15.95 |

12

| 82541 | Omega 3 | $25.57 | $25.57 |
|---|---|---|---|
| 82172 | Apo A-1 | $15.28 | $21.95 |
| 83520 | Galectin 3 | $18.34 | $18.34 |
| 82664 | HDL 2 (subclass) | $8.43 | $48.66 |
| 83695 | Lp(a) mass w/reflex to Lp(a) cholesterol | $18.34 | $18.34 |
| 83891*, 83892, 83896, 83903, 83908, 83912* | Apo E Genotype | $5.68, $5.68, $5.68, $23.74, $23.74, $5.68 | $5.68, $5.68, $5.68, $5.84, $5.84, $5.68 |
| 83891, 83892, 83896, 83903, 83908, 83912 | Factor V Leiden | $5.68, $5.68, $5.68, $23.74, $23.74, $5.68 | $5.68, $5.68, $5.68, $5.84, $5.84, $5.68 |
| 83891, 83892, 83896, 83903, 83908, 83912 | Prothrombin | $5.68, $5.68, $5.68, $23.74, $23.74, $5.68 | $5.68, $5.68, $5.68, $5.84, $5.84, $5.68 |
| 83891, 83892, 83896, 83903, 83908, 83912 | Cyp2C19 | $5.68, $5.68, $5.68, $23.74, $23.74, $5.68 | $5.68, $5.68, $5.68, $5.84, $5.84, $5.68 |
| 83698 | Lp-PLA2 | $48.08 | $48.08 |
| 86141 | hs-CRP | $18.34 | $18.34 |
| 85384 | Fibronogen | $11.09 | $12.03 |
| 82726 | FFA/NEFA | $25.57 | $25.57 |
| 83880 | NT-proBNP | $48.08 | $48.08 |
| 83525 | Insulin | $16.19 | $16.19 |
| 82607 | Vitamin B-12 | $21.35 | $21.35 |
| 82747 | RBC Folate | $24.53 | $21.34 |
| 83891, 83892, 83896, 83903, 83908, 83912 | MTHFR Genotype | $5.68, $5.68, $5.68, $23.74, $23.74, $5.68 | $5.68, $5.68, $5.68, $5.84, $5.84, $5.68 |
| **TOTAL REIMBURSEMENT** | | $727.35 | $599.09 |

* = Only billed once per panel; other codes billed for each test.

54.    However, HDL testing can be more expensive.  For example, testing services performed for E.S.Z., a Medicare patient living in South Carolina referred to HDL by Dr. Miller on January 4, 2011, consisted of the following:

13

| CPT CODE | TEST | AMOUNT BILLED | MEDICARE PAYMENT |
|---|---|---|---|
| 80061 | Lipid Panel | $46.00 | $0.00 |
| 82726 | Long Chain Fatty Acids | $58.00 | $25.41 |
| 82664 | Electrophoretic Test | $69.00 | $44.97 |
| 83695 | Assay of Lipoprotein(a) | $44.00 | $18.22 |
| 83698 | Assay Lipoprotein pla2 | $110.00 | $0.00 |
| 83701 | Lipoprotein bld hr fraction | $67.00 | $34.93 |
| 83876 | Assay myeloperoxidase | $113.00 | $47.77 |
| 83891 | Molecule isolate nucleic | $13.00 | $5.51 |
| 83892 | Molecular diagnostics | $78.00 | $33.06 |
| 83896 | Molecular diagnostics | $130.00 | $55.10 |
| 83903 | Molecule mutation scan | $440.00 | $188.64 |
| 83908 | Nucleic acid signal ampli | $275.00 | $117.90 |
| 83912 | Genetic examination | $13.00 | $5.51 |
| **TOTAL** | | $1456.00 | $577.02 |

55.    Patient ESZ's records demonstrate that Medicare (and presumably other insurers and patients without insurance) can be billed more than $1,400 for an HDL testing episode. Upon information and belief, the total reimbursement for ESZ's testing (approximately $577) would be the normal range for the tests HDL usually performs for Dr. Miller's patients.

56.    During 2012, HDL began offering the EarlyCDT-Lung test, a blood test to aid in the early detection of lung cancer in high risk patients, including long-term smokers and ex-smokers, by focusing on tumor antigens involved in the development of lung cancer. The CPT Code for HDL's EarlyCDT-Lung test is 83520, and the Medicare reimbursement is $18.34. Although offered by HDL, the EarlyCDT-Lung test is actually performed by OncImmune (USA) LLC.

57.    HDL does business with a number of commercial insurance providers in California and Illinois, including but not limited to AETNA and Blue Cross.

58.    Under process and handling agreements with referring physicians, HDL pays referral fees for patients covered by commercial insurance and government payors, including

14

Medicare, TRICARE, and Medicaid.

    **B.**    **Singulex, Inc. ("Singulex")**

    59.    Singulex, Inc. is a Delaware for-profit corporation.  Singulex's laboratory is headquartered at 1650 Harbor Bay Parkway, Suite 200, Alameda, CA 94502, USA, Telephone Number: (888) 995-6123. Singulex is privately held.

    60.    Singulex claims to be a "Leader in Advanced Cardiovascular Monitoring," by providing "high-value, advanced tests for the diagnosis and monitoring of chronic diseases." Singulex claims that its testing services improve patient care and reduce healthcare costs, and also "empower physicians and patients to better manage heart health" by "providing physicians with information that can allow them to earlier diagnose, better monitor, and more effectively manage chronic disease progression prior to the onset of acute clinical symptoms."

    61.    Singulex laboratory testing that is relevant to this *qui tam* complaint includes Singulex's Advanced Cardiovascular disease (CVD) Testing Menu, which includes tests for Cardiopathology/Heart Function and Vascular Inflammation.

    62.    Singulex currently does business in 28 states.  Singulex's NPI is 1184859191.

    63.    Singulex Advanced Panel, which allegedly determines a patient's cardiac risk, includes, but is not limited to, the following tests:

| CPT CODE | TEST | SOUTH CAROLINA MEDICARE REIMBURSEMENT RATE | NORTH CAROLINA MEDICARE REIMBURSEMENT RATE |
|---|---|---|---|
| 84484 | Cardiac Troponin-I | $13.94 | $13.94 |
| 83520 | Interleukin-6 | $18.34 | $18.34 |
| 83520 | Interleukin-17A | - | - |
| **TOTAL** | | $32.28 | $32.28 |

    64.    Many of the Singulex requisition forms show that Dr. Miller refers most of his

patients to Singulex for the Singulex Advanced Panel.

65.     HDL does business with a number of commercial insurance providers in California and Illinois, including but not limited to AETNA and Blue Cross.

66.     Under process and handling agreements with referring physicians, HDL pays referral fees for patients covered by commercial insurance and government payors, including Medicare, TRICARE, and Medicaid.

67.     Neither HDL nor Singulex employs laboratory technicians to draw blood from patients referred to them by physicians. Instead, HDL and Singulex blood samples are drawn, processed, and shipped to HDL and Singulex laboratories by independent laboratories or by physicians who employ their own phlebotomist/lab technician.

## VI.     BACKGROUND ON FEDERAL AND STATE HEALTH CARE PROGRAMS

### A.     The Medicare Program

#### 1.     Medicare Payments: Only Medically Necessary Services

68.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

69.     Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions.  Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

70.     The Medicare Program is administered through the United States Department of

16

Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.  Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

71.     Medicare now has four parts: Part A (Hospital Insurance); Part B (Medical Insurance); Part C (Managed Care Plans); and the recently enacted Part D (Prescription Drug) Program.

72.     Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

73.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, including emergency care.  Part B helps pay for covered health services and supplies when they are medically necessary.   Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

74.     Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs.  Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the federal government.  Part D Sponsors are charged with and responsible for accepting Medicare Part D prescription claims, determining coverage, and making payments from the Medicare Part D funds.

75.     Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in

addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

76.    The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

77.    Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" or "Medicare Administrative Contractors" (MACs) to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage and making payments from the Medicare Trust Fund. Laboratory testing provided on an out-patient basis is typically covered through Medicare Part B.

78.    The principal function of Medicare intermediaries and carriers is to pay the claims of Medicare providers, and to audit such claims to ensure that providers follow the strictures of the Medicare Program.

79.    The Medicare carriers who receive laboratory testing claims at issue here are: for HDL in Virginia, Palmetto GBA (11302, MAC-Part B); for Singulex in Northern California, Palmetto GBA (01102, MAC-Part B); and for LabCorp in North Carolina, Palmetto GBA (11502, MAC-Part B).

80.    Section 1862(a)(1)(A) of the Social Security Act provides that Medicare payment

18

may not be made for services that are not reasonable and necessary.  To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent, they are medically necessary.  Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

81.     As a condition for Medicare payment, a physician must certify the necessity of the services and, in some instances, recertify the continued need for those services. *See* Sections 1814(a)(2) and 1835(a)(2) of the Social Security Act; *see also* 42 C.F.R. § 424.10.  In order for the federal government to cover Medicare Part A, Medicare Part B, or a Medicare Part C plan to provide coverage, all care must be "medically necessary."

82.     Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare (or a Medicare Part C plan) agrees that the care is necessary and proper. Services or supplies that are needed for the diagnosis or treatment of a medical condition must meet the standards of good medical practice in the local area.

### 2.    <u>Medicare Only Pays for Medically Necessary Clinical Laboratory Testing</u>

83.     Medicare Part B pays for clinical laboratory testing performed by companies such as HDL, Singulex, and LabCorp. These independent laboratories perform testing on specimens (also known as "samples") from patients referred to the "independent" laboratory by his or her physician.

84.     As a condition of payment by Medicare, diagnostic laboratory tests must be ordered by a physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem.  The physician must also use the results in the management of the beneficiary's specific medical problem. 42 C.F.R. §

19

410.32(a).

85. Medicare does not cover purely prophylactic lipid testing (lipid screening):

> Routine screening and prophylactic testing for lipid disorder are not covered by Medicare. While lipid screening may be medically appropriate, Medicare by statute does not pay for it. Lipid testing in asymptomatic individuals is considered to be screening regardless of the presence of other risk factors such as family history, tobacco use, etc.

> Once a diagnosis is established, one or several specific tests are usually adequate for monitoring the course of the disease. Less specific diagnoses (for example, other chest pain) alone do not support medical necessity of these tests.

The Medicare National Coverage Determination on Lipid Testing National Coverage Determination (NCD) for Lipid Testing (190.23), available at http://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=102&ncdver=2&bc=AAEAAAAAAAAA&.

86. But when a patient is placed on dietary therapy or prescribed medication for high cholesterol, Medicare pays for periodic lipid testing. Medicare will cover "[a]ny one component of the panel or a measured LDL may be medically necessary up to six times the first year for monitoring dietary or pharmacologic therapy… If no dietary or pharmacological therapy is advised, monitoring is not necessary."  National Coverage Determination (NCD) for Lipid Testing (190.23).  Medicare also pays for lipid testing once annually for patients on "long term anti-lipid dietary or pharmacologic therapy and when following patients with borderline high total or LDL cholesterol levels." Id.

87. The physician who orders clinical laboratory services "must maintain documentation of medical necessity in the beneficiary's medical record." 42 C.F.R. § 410.32(d)(2).

### 3.    The Independent Laboratory Bills Medicare for Testing Services

88. The majority of laboratory testing services are paid by Medicare on a fee-for

service ("FFS") basis. Medicare pays for most outpatient clinical laboratory services based on the Clinical Laboratory Fee Schedule in accordance with Section 1833(h) of the Social Security Act. The Medicare payment to the laboratory is the lesser of the laboratory's actual charge, the local fee for a geographic area, or a national limit. In accordance with the Social Security Act, national limits are set at a percent of the median of all local fee schedule amounts for each laboratory test code. Each year, fees are updated for inflation based on the percentage change in the Consumer Price Index. However, legislation by Congress can modify the update to the fees. Thus, under the Clinical Laboratory Fee Schedule, the amount paid to the lab is usually National Limitation Amount (NLA).   Medicare Claims Processing Manual [Pub. 100-4] Chapter 16, Section 20. The Clinical Laboratory Fee Schedule is updated annually.

89.     The clinical laboratory that provides the testing services bills the Government health programs directly, including Medicare. Medicare Part B pays approximately 80 percent of the Medicare-approved amount for these testing services.

90.     The laboratory bills Medicare from the location the test is performed. For example, claims for tests performed at Defendant LabCorp's facility in North Carolina are submitted from LabCorp's consolidated billing center in North Carolina.

91.     A clinical laboratory must accept assignment of the Medicare beneficiary's benefit in order to receive Part B payment for laboratory tests based on the Laboratory Fee Schedule. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 30.1 - Mandatory Assignment for Laboratory Tests. Thus, Part B deductible and coinsurance (co-payments) do not apply to laboratory services provided by a physician or by an independent laboratory. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 30.3 - Method of Payment for Clinical Laboratory Tests - Place of Service Variation.

21

92.     The clinical laboratory submitting the claim to a federal healthcare program must maintain documentation it receives from the ordering physician, as well as documentation that the information that the lab submitted with the claim accurately reflects the information it received from the ordering physician or non-physician practitioner. 42 C.F.R. § 410.32(d)(2)(ii).

93.     During claims review, CMS may deny claims by laboratories where documentation provided does not demonstrate that the service is reasonable and necessary, or where the providers fail to provide documentation requested to establish medical necessity. 42 C.F.R. § 410.32(d)(3)(ii).

94.     The entity submitting the claim may request from the referring physician additional diagnostic and other medical information to document that the services it bills are reasonable and necessary. If the entity requests additional documentation, it must request material relevant to the medical necessity of the specific test(s). 42 C.F.R. § 410.32(d)(3)(iii).

95.     If a physician requests an independent laboratory to obtain specimens in situations which do not meet, or without regard to whether they meet, the medical necessity criteria in Chapter 15 of the Medicare Benefit Policy Manual, an educational contact with the prescribing physician is warranted and, where necessary, corroborating documentation should be obtained on claims until the carrier is assured that the physician prescribes such services only when the criteria are met. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 60.2.

### 4.     Limits on Medicare Payments for Blood Draws (Venipuncture)

96.     In addition to payment for the laboratory testing service itself, CMS may make a separate payment to providers for collection of the specimen. Medicare reimburses medical providers a specimen collection fee for drawing a blood sample through venipuncture (i.e., inserting into a vein a needle with syringe or vacutainer to draw the specimen) or collecting a

urine sample by catheterization. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 60.1.

> **a.**     **Medicare Pays for Blood Draws (Venipuncture) by a Physician**

97.     Medicare reimburses a physician for a blood specimen collection (venipuncture) only when (1) it is the accepted and prevailing practice among physicians in the locality to make separate charges for drawing or collecting a specimen, and (2) it is the customary practice of the physician performing such services to bill separate charges for drawing or collecting the specimen. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 60.1.1 - Physician Specimen Drawing, (Rev. 1, 10-01-03).

98.     A physician who performs the blood draws on their own patients for blood samples that are then sent to independent laboratories reports the service with HCPCS Code 36415, "collection of venous blood by venipuncture." According to the 2012 Clinical Diagnostic Laboratory Fee Schedule for Medicare, the fee for HCPCS Code 36415 (venipuncture) was $3.00.

> **b.**     **Medicare Pays for Blood Draws (Venipuncture) by a Clinical Laboratory**

99.     Medicare allows separate charges by laboratories for drawing blood, whether or not the blood is referred to a hospital or independent laboratory. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 60.1.2 - Independent Laboratory Specimen Drawing (Rev. 1, 10-01-03).  In 2012, the service code and payment for specimen collection by a laboratory was also HCPCS 36415.

100.     Medicare does not pay the collection ("blood draw") fee to anyone who has not actually extracted the specimen. In addition, only one collection fee is allowed for each type of specimen per patient encounter, regardless of the number of specimens (*i.e.*, vials of blood)

drawn. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 60.1.

101.    Medicare does not pay for routine handling of blood samples referred by one laboratory to another. *See* Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 60.1.2 – Independent Laboratory Specimen Drawing (Rev. 1, 10-01-03).

### B.    The Medicaid Program

102.    Medicaid is the state-federal funded program for low income children and families, the elderly and people with severe disabilities. Congress created Medicaid in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act.

103.    Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

104.    Medicaid is a cooperative federal-state public assistance program which is administered by the states. The Centers for Medicare and Medicaid Services ("CMS") is the federal agency that administers the Medicaid program, and requires all states to provide certain mandatory services. However, because states must also provide funding for their Medicaid program, each state chooses several optional services they wish to provide in addition to the mandatory Medicaid services.

105.    Funding for Medicaid is shared between the Federal Government and those state Governments that choose to participate in the program. Federal support for Medicaid is substantial, often exceeding 50% of state Medicaid program funding. For example, in 2012, the federal government provided approximately 65.51% of the funding for North Carolina Medicaid. That same year, the federal government provided 70.43% of the funding for Medicaid programs in South Carolina. The remaining funds were provided by the state governments.

106.    Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and, therefore, specific Medicaid coverage and eligibility guidelines vary

by state.

### 1.    Medicaid Programs Pay for Necessary Clinical Laboratory Testing

107.    Like the Medicare Program, Medicaid only covers health services or supplies, including laboratory testing, that are necessary for the diagnosis or treatment of a medical condition, in keeping with the standards of good medical practice in the local area. While Medicaid reimbursement for laboratory testing varies by state, there is generally a requirement that the testing is medically necessary.

108.    For example, the North Carolina Medicaid program covers only laboratory testing that is medically necessary. North Carolina Medicaid defines "medically necessary" as: "the procedure, product, or service is individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the recipient's needs." NC Division of Medical Assistance, Laboratory Services, Medicaid and Health Choice Clinical Coverage Policy 1S-3, Section 3.1.

109.    South Carolina Medicaid also covers laboratory testing only if it is "medically necessary for the appropriate care of the patient." South Carolina Health and Human Services Physicians Provider Manual, Section 2, p. 190.

### 2.    Medicaid Coverage for Blood Draws (Venipuncture)

110.    Like Medicare, state Medicaid programs also permit a physician to bill for venipuncture when the physician's office actually draws blood samples to be sent to independent clinical laboratories for testing.

111.    For example, North Carolina Medicaid reimburses physicians who actually perform blood draws for samples, and, without performing any testing, sends them to non-related outside clinical laboratories. North Carolina Medicaid added CPT procedure code 36415 (collection of venous blood by venipuncture) as a covered service as of January 1, 2005, and

since then, North Carolina Medicaid providers have been required to use Code 36415 when billing for blood draws. *See* Collection of Specimens, October 2012 Medicaid Bulletin, NC Division of Medical Assistance. http://www.ncdhhs.gov/dma/bulletin/1012bulletin.htm#cpt.

112.    North Carolina Medicaid covers only one collection fee per beneficiary regardless of the number of specimens drawn. *See* Collection of Specimens, October 2012 Medicaid Bulletin, NC Division of Medical Assistance. http://www.ncdhhs.gov/dma/bulletin/1012bulletin.htm#cpt.

113.    North Carolina Medicaid specifically excludes coverage for handling and shipment of specimens. NC Division of Medical Assistance, Laboratory Services, Medicaid and Health Choice Clinical Coverage Policy 1S-3, Section 4.2.

114.    South Carolina Medicaid also allows for physicians who perform blood draws to charge Medicaid using Code 36415.  The physician or clinic provider may charge the draw fee regardless whether he performs the testing.  However, a physician may not bill for a blood draw alone and also bill for an office visit or lab test on the same date.  See South Carolina Health and Human Services Physicians Provider Manual, Section 2, p. 191.

## C.    Other Government-Funded Health Care Programs Pay for Laboratory Tests

### 1.    TRICARE/CHAMPUS and other Federal Healthcare Benefits

115.    In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of laboratory testing services under several other federal health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA and the Federal Employees Health Benefit Program ("FEHBP").

116.    CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. It offers military families a choice of three options: TRICARE Prime, TRICARE Extra, and

26

TRICARE Standard (formerly known as CHAMPUS (Civilian Health & Medical Program for Uniformed Services), a health care plan for military dependents and retirees operated by the DoD.

117.     CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service-connected disability.

118.     The FEHBP, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

119.     Like Medicare, TRICARE and other federal healthcare benefit programs cover only medically necessary inpatient and outpatient care. TRICARE defines medically necessary care as services or supplies provided by a hospital, physician, and/or other provider for the prevention, diagnosis, and treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; provided in accordance with approved and generally accepted medical or surgical practice; not primarily for the convenience of the patient, the physician, or other providers; and not exceeding (duration or intensity) the level of care, which is needed to provide safe, adequate and appropriate diagnosis and treatments. *See* http://www.usfhp.net/pdfs/Member_Handbook.pdf.

120.     TRICARE always requires a referral and/or prescription from the member's primary care physician (PCP) for treatment, including laboratory tests.

### 2.     Other State-Funded Healthcare Programs

121.     In addition, the named states fund various state-sponsored healthcare programs which cover laboratory testing.  These include state employees' healthcare benefits.  For example, Dr. Miller's patients who have been referred to HDL, Singulex, and LabCorp include beneficiaries of the South Carolina employees' healthcare program.

### 3.    Private Insurance Pays for Medically Necessary Laboratory Tests

122.    Private insurance plans also pay for laboratory testing provided by HDL, Singulex, and LabCorp.  Upon information and belief, the contracts for those private insurers whose patients are drawn into the LabCorp, HDL, and Singulex referral scheme mirror the Medicare and Medicaid requirements by mandating that laboratory testing billed to private insurers is not the result of an illegal inducement, and is medically necessary.

## VII.    THE APPLICABLE LAW

### A.    The Federal False Claims Act – Overview

123.    Title 31 USCA Section 3729 of the Federal False Claims Act provides as follows:

"(a) Liability for Certain Acts -
(1)    IN GENERAL - Subject to paragraph (2), any person who -
(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
(D)    has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;
(E)    is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;
(F)    knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or
(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the

amount of damages which the Government sustains because of the act of that person.

**B.     The Federal Anti-Kickback Statute**

124.    Enacted in 1972, the federal Anti-Kickback Statute, 42 U.S.C. § 13207b(b), protects patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions.  When a company pays kickbacks to a doctor in order to induce him/her to use the company's products or services, it fundamentally compromises the integrity of the doctor-patient relationship.  Government-funded healthcare programs, such as Medicare and Medicaid, rely upon physicians to decide what treatment is appropriate and medically necessary for patients, and, therefore, payable by such healthcare program.

125.    The federal Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:  (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.  42 U.S.C. § 1320a-7b(b)(1) and (2).

126.    A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the federal Anti-Kickback Statute must be excluded (*i.e.,* not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(1).

127.    The term "remuneration" encompasses anything of value, in cash or in-kind, directly or indirectly, covertly or overtly.  42 U.S.C. § 1320a-7b(b)(1).

128.    The Anti-Kickback Statute has been interpreted by the majority of federal courts

to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.  *United States v. Greber*, 760 F.2d 68, 69 (3d Cir. 1985) (holding that the Anti-kickback statute is violated if "one purpose of the payment was to induce future referrals … even if the payments were also intended to compensate for professional services."); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) (adopting the holding in *Greber*); <u>*see also*</u> *Feldstein v. Nash Community Health Services*, 51 F.Supp.2d 673 (E.D.N.C. 1999)(recognizing that the Medicare fraud statute is violated if "one purpose of the payment was to induce future referrals," and citing *Kats* and *Greber*).

129.    Proof of an explicit quid pro quo is not required to show a violation of the Anti-Kickback Statute.

130.    The United States Department of Health & Human Services ("HHS") has published "safe harbor" regulations that define practices not subject to the Anti-Kickback Statute because such practices are unlikely to result in fraud or abuse.  42 C.F.R. § 1001.952.  The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor.  However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor.  As further explained herein, none of the practices at issue in this *Qui Tam* Complaint meet these safe harbor regulations.

131.    Compliance with the Anti-Kickback Statute is a *condition of payment* under Government healthcare programs, including the Medicare and Medicaid programs, and that condition applies regardless of whether the kickback payor or recipient is submitting the claim to the Government.  Claims that arise from a kickback scheme are per se false, and violate the False Claims Act, because they are the result of a kickback – no further express or implied false

30

statement is required to render such infected or tainted claims false, and none can wash the claim clean.

132.    On March 23, 2010, as part of the Patient Protection and Affordable Care Act, PL 111-148 ("PPACA"), the Anti-Kickback Statute was amended to explicitly provide that a claim resulting from a violation of the Anti-Kickback Statute is a violation of the federal False Claims Act.  Specifically, the federal AKS was amended by adding subsection (g) to 42 U.S.C. § 1320a–7b. 42 U.S.C. 1320a–7b(g), which states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code.''

133.    In addition, Section 6402(a) of the PPACA established section 1128J(d) in the Social Security Act regarding reporting and returning Medicare and Medicaid overpayments. Section 1128J(a) requires a person who has received an overpayment to report and return the overpayment by the later of (i) 60 days after the overpayment was identified or (ii) the date any corresponding cost report is due.  The knowing and improper failure to return an overpayment subjects the recipient to liability under the federal False Claims Act, 31 U.S.C. § 3730(a)(1)(G).

C.    **Claims for Lab Tests Tainted by AKS Violations Are Fraudulent**

1.    **HHS-OIG: Fraud Alert on Lab Services and Tainted Referrals**

134.    The Office of Inspector General (OIG) has issued fraud alerts on clinical laboratory services. OIG has noted that "[m]any physicians and other health care providers rely on the services of outside clinical laboratories to which they may refer high volumes of patient specimens every day. The quality, timeliness and cost of these services are of obvious concern to Medicare and Medicaid patients and to the programs that finance their health care services. Since the physician, not the patient, generally selects the clinical laboratory, it is essential that the physician's decision regarding where to refer specimens is based only on the best interests of the

31

patient." OIG Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (Issued October 1994), https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

135.    OIG has stated that "[w]henever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business." OIG Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (Issued October 1994), https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

136.    Likewise, "whenever a referral source solicits or receives anything of value from the laboratory," the same inference (that the thing of value is offered to induce the referral of business) may be made. By "fair market value'' OIG means "value for general commercial purposes," which "must reflect an arm's length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them." OIG Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (Issued October 1994), https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

137.    OIG has issued a Special Fraud Alert regarding kickbacks associated with a lab that provides phlebotomy services to referring physicians. In particular, OIG has noted:

- When permitted by State law, a laboratory may make available to a physician's office a phlebotomist who collects specimens from patients for testing by the outside laboratory.

- While the mere placement of a laboratory employee in the physician's office would not necessarily serve as an inducement prohibited by the anti-kickback statute, the statute is implicated when the phlebotomist performs additional tasks

that are normally the responsibility of the physician's office staff;

- In such a case, the physician, the phlebotomist, and the laboratory may have exposure under the anti-kickback statute.

OIG Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (Issued October 1994).

138.    As described below, under compensation arrangements between HDL and Singulex, referring physicians receive "processing" fees from HDL and Singulex. The AKS is implicated by LabCorp's conduct because the LabCorp technician performs processing tasks related to the HDL and Singulex blood samples that are the responsibility of the physician receiving the HDL and Singulex processing fee payments.

### D.    State False Claims Acts ("State FCAs")

139.    The false claims acts of the sovereign States of North Carolina, California, and Illinois generally mirror the federal FCA. Thus, the state FCAs at issue impose liability on a person who:

- knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

- knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

- conspires to commit a violation of the false claims act; or

- knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

140.    The false claims acts of the States of North Carolina, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Louisiana, Michigan, Minnesota, New

33

Jersey, New York, Tennessee, Texas, Virginia, and Wisconsin each provide for liability to the state for a civil penalty plus damages.  Most of the relevant state FCAs provide for Defendant LabCorp to pay three (3) times the amount of damages which the State sustains because of the FCA violation.

141.    Many of the named States also have anti-kickback laws and prohibitions against physician referrals to entities with which physicians have a financial relationship.

142.    Both California and Illinois have *qui tam* statutes that permit relators to raise allegations of fraud by individuals or entities against private insurance companies.  The statutes operate similarly to the federal and state FCAs, and are written to prevent fraud occurring in the private health care insurance market.

143.    Upon information and belief, Defendant LabCorp is paid by private insurers that cover California-based and Illinois-based patients who have been referred for testing as a result of the LabCorp scheme.

144.    Upon information and belief, private healthcare insurance companies in California and Illinois require the same conditions of payment and prohibitions on unnecessary medical testing found in the Medicare and Medicaid programs.

145.    The CIFPA prohibits as unlawful the following:

> It is unlawful to knowingly employ runners, cappers, steerers, or other persons…to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer.

Ca. Ins. Code § 1871.7(a).  Any person or entity found in violation of this section or specifically identified corollary criminal code sections is subject to civil penalties ranging from $5,000.00 to $10,000.00 per false claim plus three times the amount of each false claim for compensation from an insurer.  Cal. Ins. Code § 1871.7(b).

146.     Under the CIFPA, any interested person may bring a sealed civil action for a violation of Section 187.7 on behalf of the State of California. Ca. Ins. Code § 1871.7(e)(1), (2). If the relator is ultimately successful and the District Attorney intervenes in the lawsuit, the relator is entitled to the recovery of fees, expenses, and a relator's share of between 30% and 40% according to the priority specified in the statute.  Cal. Ins. Code § 1871.7(g)(1)(A)(iii)(I), (IV).  If neither the District Attorney nor the Insurance Commissioner intervene and the relator is successful in settling his/her lawsuit or attaining final judgment, the relator may receive between 40% and 50% of the proceeds plus costs and expenses.  Cal. Ins. Code § 1871.7(g)(2)(A).

147.     The Illinois Insurance Claims Fraud Prevention Act ("ILCFPA") is similar to the CIFPA.  In Section 92/5(a), the ILCFPA prohibits kickbacks and states:

> …[I]t is unlawful to knowingly offer or pay any remuneration directly or indirectly, in case or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer.

740 Ill. Comp. Stat. § 92/5(a).  If a defendant is in violation of Section 92/5(a) or specifically identified corollary criminal code sections, he/she must reimburse three times the amount of money defrauded as well as civil penalties ranging from $5,000.00 to $10,000.00 per fraudulent claim.  740 Ill. Comp. Stat. § 92/5(b).

148.     Pursuant to Section 15 of the ILCFPA Section 15, an interested person may bring a sealed civil action for a violation of the ILCFPA on behalf of him/herself and the State of Illinois.  740 Ill. Comp. Stat. § 92/15(a), (b).  If the State's Attorney and/or the Attorney General intervene in the *qui tam* action, and it is ultimately successful, the relator is entitled to at least 30% of the recovery.  740 Ill. Comp. State § 92/25(a).  If neither government entity intervenes and the relator successfully pursues the lawsuit on his/her own, the relator is entitled to recover

not less than 40% of the proceeds.  740 Ill. Comp. Stat. § 92/25(b).

149.    Relators here are the original sources of the allegations under the CIFPA and ILCFPA.

## VIII.    ALLEGATIONS: DEFENDANT LABCORP, AND CO-CONSPIRATORS HDL AND SINGULEX, PROVIDE ILLEGAL INDUCEMENTS FOR PATIENT REFERRALS FOR LABORATORY TESTS

### A.    Overview of HDL and Singulex Operations

150.    Neither HDL nor Singulex employs its own outside sales force.  Instead, BlueWave Healthcare Consultants, Inc., ("BlueWave") serves as the marketing agent for HDL and Singulex.  BlueWave sales representatives promote Singulex and HDL products to physicians and physician practices throughout the country.

151.    On or about June 1, 2010, BlueWave signed an agreement with Singulex for the exclusive right to promote Singulex testing services to physicians in certain sales territories.  The BlueWave sales territories for Singulex have since expanded.

152.    The BlueWave-Singulex marketing agreement mandates that Singulex pay physicians and independent lab companies for processing and handling of blood samples.

153.    Relators allege, upon information and belief, that sometime before January 1, 2010, BlueWave also entered into an agreement with HDL for the near-exclusive right to promote HDL products to physicians across the United States, which was similar to the agreement between Singulex and BlueWave.  Relators further allege upon information and belief, and therefore aver, that HDL is similarly required to pay physicians and independent lab companies for processing and handling fees for HDL tests.

### B.    Relators Discover HDL and Singulex Payments to Dr. Miller for Referrals

154.    As stated above, Relator Webster has been a registered nurse for Dr. Miller's practice since May 2008. Relator Lutz was contracted in early 2011 to assist Dr. Miller with

billing. Relators have obtained knowledge and information that LabCorp, HDL, and Singulex participate in a scheme to fraudulently induce Dr. Miller and other physicians to refer thousands of patients for testing that is not reimbursable by Government healthcare programs.

### 1. Lloyd Miller, MD.

155. Lloyd Miller Jr., MD is a primary-care physician licensed to practice in the state of South Carolina.

156. Since September of 2011, Dr. Miller has done business as Internal Medicine of Carolinas (owned by Carolinas Medical Alliance), 2501 S. Vance Drive, Suite B, Florence, SC 29505. Before that time, Dr. Miller did business as Internal Medicine Associates, PC, with an office located at 805 Pamlico Hwy, Suite B 310, Florence, SC 29505. Internal Medicine Associates is also the alter ego of Lloyd Miller, MD.

157. LCM Enterprises of Florence, Inc. ("LCM"), is a South Carolina corporation formed in 1991 by Lloyd Miller, MD, whose principal place of business is located at 2501 South Vance Drive, Suite B, Florence, SC 29505. LCM is also the alter ego of Lloyd Miller, MD.

158. Dr. Miller's staff has included, but is not limited to, the following employees: Ginger Tolson, Office Manager; Relator, Kayla Webster, RN, Nursing Supervisor; and office assistants Mandy Floyd and Kandice Smith. Dr. Miller does not employ a phlebotomist to draw blood for patients' laboratory tests.

### C. BlueWave & HDL Lure Physicians with "Processing" Fees

### 1. BlueWave and HDL Redirect Dr. Miller's Referrals to HDL

159. Beginning in late 2009 or early 2010, BlueWave marketing agents began promoting HDL testing services. Immediately, Dr. Miller stopped referring patients to Berkeley HeartLab ("Berkeley"), a clinical laboratory which provides testing related to coronary disease, and began referring his patients to HDL.

### a.    "Berkley" is Pre-Printed on His Encounter Page

160.    Before they began marketing HDL clinical laboratory testing services, BlueWave's sales representatives (Carnaggio and Dent) marketed Berkeley tests related to coronary disease to Dr. Miller. In fact, Dr. Miller referred patients to Berkeley so often that the Berkeley (misspelled "Berkley") test was added to Dr. Miller's pre-printed patient encounter sheet.

161.    Dr. Miller ordered Berkeley tests for nearly every patient in his robust practice.

### b.    After Dr. Miller Abruptly Shifts to HDL, "Berkeley" Means "HDL"

162.    Relator Webster observed Dr. Miller abruptly stop referring patients to Berkeley on or about January 1, 2010.  Dr. Miller immediately began referring all, or nearly all, patients to HDL.

163.    Soon after shifting patient referrals to HDL, Dr. Miller started receiving monthly payments from HDL that were calculated at $20 for per patient listed on a "draw log" which accompanied the check from HDL to Dr. Miller.

164.    HDL maintained the "draw log," which listed each patient referred to HDL. One purpose of the monthly payments by HDL to Dr. Miller was to induce him to refer patients to HDL.

165.    While Dr. Miller almost immediately changed his referrals from Berkeley to HDL, he did not immediately change his pre-printed patient encounter form. After January 1, 2010, when a patient's encounter form was marked "Berkley," this meant that the patient was referred to HDL for testing.

166.    In addition to paying the $20.00 fee for every patient listed on the "draw log," to facilitate the referrals for testing, HDL provided Dr. Miller with pre-printed laboratory

requisition forms, all of the necessary collection, and shipping supplies (blood collection tubes, bags, ice packs, shipping boxes and pre-paid FedEx labels). Dr. Miller's office ordered these supplies, as needed, by sending a request to HDL via facsimile.

167.    Dr. Miller's staff does not use the blood draw "kits" provided by HDL. When Dr. Miller's staff receives the HDL blood draw supplies, they provide these to the phlebotomist provided by Defendant LabCorp. The LabCorp technician stores the HDL blood draw supplies, draws blood samples for HDL testing, and processes the samples for HDL.

**2.    HDL Pays Referring Physicians, Including Dr. Miller, Bogus "Processing" Fees**

168.    As stated above, in March of 2011, Relator Lutz began to provide billing services for Dr. Miller.  After March 2011, but before September 2011, in approximately August 2011, someone left an unmarked envelope at Relator Lutz's office.   When Ms. Lutz opened the envelope, it contained copies of payment checks from HDL and Singulex to Dr. Miller or his companies for bogus "processing fees." It also contained copies of "draw logs," lists of patients referred by Dr. Miller to HDL and Singulex in support of each payment.

169.    HDL pays Dr. Miller $20.00 for each patient referred to HDL for laboratory testing.

170.    When Relator Lutz closely examined the documents related to HDL's payments to Dr. Miller, she noted the following:

- From January 2010 through the end of 2012, Relators estimate that HDL paid Dr. Miller $133,300 for referrals of approximately 6,665 patients, or between 150 and 185 patients per month.

- Estimated conservatively, 47 percent of the patients referred by Dr. Miller to HDL were beneficiaries of Government Healthcare programs.

171.    HDL kickback checks may be made payable to the physician, the physician's practice, or a related corporate entity.  For example, HDL has made payments to Dr. Miller through checks made payable to "Internal Medicine Associates, P.C.," which were signed by HDL's President, CEO, and founder, Tonya Mallory.

172.    HDL's practice of offering and paying a $20.00 per patient inducement to referring physicians, including Dr. Miller, continues today.

        3.    **HDL "Processing"  Arrangements with Physicians, Including Dr. Miller, Are Bogus**

173.    In literature provided to physician customers, HDL describes the many steps it considers part of the processing services that are the responsibility of referring physicians (after the blood draw), including the following:

- Immediately invert 8-10 times after blood draw;

- Allow to clot for 30 minutes in an upright position;

- Centrifuge for 15 minutes at 3000 rpm;

- Place tube in the biohazard bag provided with absorbent material;

- Place in refrigerator until ready for shipment;

- Place specimen(s) inside biohazard bag with absorbent pad;

- Complete required information on the requisition form;

- Place test requisition in the outside pouch of the biohazard bag;

- Place a frozen cool-pack brick in the bottom of Styrofoam cooler;

- Place three to four paper towels (for insulation) over the brick;

- Insert the refrigerated specimen bags in the Styrofoam cooler;

- Place two paper towels over the refrigerated specimens;

- Immediately replace the Styrofoam cooler lid before closing the box.

174.    HDL pays referring physicians under arrangements purporting to compensate physicians for "processing" blood samples for HDL tests.

175.    Relators allege upon information and belief, that HDL enters into bogus service arrangements with referring physicians in an attempt to disguise HDL's inducements for referrals as market-value compensation for bona fide professional services.

176.    In contrast to HDL's product literature, Relator Webster has observed that HDL's referring physician, Dr. Miller, does not provide any substantive blood sample processing services. Rather, the lab technician provided to Dr. Miller's office by Defendant LabCorp, performs all (or nearly all) of the blood processing services for patients referred to HDL.

177.    Dr. Miller's staff performs only minimal processing tasks on HDL blood samples: completing required information on the requisition form; attaching labels to tubes containing blood samples; placing test requisition in the outside pouch of the biohazard bag; placing a frozen cool-pack brick in the bottom of Styrofoam cooler and adding the refrigerated specimen bags; replacing the cooler lid; and closing the box.

178.    The LabCorp technician assigned to Dr. Miller's office performs all of the HDL blood draws, as well as most of the HDL processing tasks:  immediately invert 8-10 times after blood draw; allow to clot for 30 minutes in an upright position; centrifuge for 15 minutes at 3000 rpm; place tube in the biohazard bag provided with absorbent material; and place in refrigerator until ready for shipment.

179.    Even if the blood processing services were performed by Dr. Miller or his staff, the $20.00 payment by HDL exceeds fair market value, and the total compensation to Dr. Miller is directly related to the number (volume) of his patient referrals.

180.    Nonetheless, and without regard to the fair market value of Dr. Miller's services,

41

HDL pays Dr. Miller the $20.00 to perform minimal services on blood that is drawn and largely processed by Defendant LabCorp.

### 4.    Singulex's Inducements: $10 Per Referral Are Bogus "Processing" Fees

181.    BlueWave became the exclusive marketing agent for Singulex in June 2010. About that same time, BlueWave, through its marketing agents, began promoting Singulex testing services to physicians in their sales territory, including Dr. Miller.

182.    As stated above, when BlueWave's sales representatives (Carnaggio and Dent) marketed Berkeley clinical laboratory tests related to coronary disease, Dr. Miller had the "Berkley" ("B") test added to his patient encounter sheet, but he did not immediately change his pre-printed patient encounter form. Thus after January 1, 2010, when a patient was referred to HDL, the encounter form box next to "Berkley" was selected.

183.    When BlueWave started marketing Singulex testing with HDL, Dr. Miller began referring patients to both HDL and Singulex.  For example, Dr. Miller would note on the patient encounter sheet that the patient should have "Berkley/Singulex," or "B/S" testing when he was referring patients to HDL and Singulex.

184.    During June or July 2010, Dr. Miller began to refer all of his patients for testing by both Singulex and HDL. Soon thereafter, Dr. Miller began to receive payments from Singulex of $10.00 per patient referral, in addition to the payment of $20.00 per patient referral that he received from HDL. Thus, for patients referred to both HDL and Singulex, Dr. Miller received $30.00 each time the patient was tested.  Like the HDL payments, one purpose of the payments by Singulex was to induce Dr. Miller to refer patients to Singulex for testing.

185.    When Relator Lutz examined the documents related to Singulex's  payments to referring physician Miller, she noted the following:

42

- From July 2010 through the end of 2012, Singulex paid Dr. Miller an estimated $55,540 for referrals of approximately 5,554 patients, or between 150 and 185 patient referrals per month.

- Conservatively, 47 percent of the patients referred were beneficiaries of Government Healthcare programs.

186.    Singulex's practice of offering and paying a $10.00 per patient inducement to referring physicians, including Dr. Miller, continues to today.  The Singulex checks to Dr. Miller were signed by Singulex's corporate controller.

187.    HDL and Singulex kickback checks may be made payable to the physician, the physician's practice, or a related corporate entity. For example, HDL and Singulex have a compensation arrangement with Dr. Miller, under which HDL and Singulex have made payments to various entities associated with Dr. Miller.  Both HDL and Singulex have made payments to Dr. Miller through checks made payable to "Internal Medicine Associates, P.C." Singulex has also made payments to Dr. Miller through checks made payable to "LCM Enterprises of Florence, Inc."

188.    The named parties to the Singulex process and handling "Agreement for Singulex Clinical Lab Cardiovascular Testing" are Singulex and "LCM," Dr. Miller's alter ego. Singulex's former CEO, Philippe Goix, signed the processing and handling agreement on behalf of Singulex.

### 5.    Singulex "Processing Services" Agreements Are False Records

189.    Singulex has entered into a sham agreement with Dr. Miller titled "Agreement for Singulex Clinical Lab Cardiovascular Testing." In the agreement, Singulex states that the physician, Dr. Miller, is  paid the $10.00 fee to perform the following "processing services:"

43

- The phlebotomy draw;

- Allocation of specimens into multiple vials as defined in the Singulex Specimen Collection Instructions;

- Assignment of labels to the vials;

- Packing of specimens into the Singulex shipping kits provided to the practice;

- Labeling of the shipment package; and

- Scheduling of shipment pickup.

190.    Singulex also has literature which describes the tasks it considers part of the processing services to be performed by physicians who refer patients to Singulex for laboratory testing:

- Invert 4-5 times;

- Centrifuge for 15 minutes at 3000 RPM;

- Refrigerate;

- Place tube into front pouch of Specimen Transport Bag;

- Fold and place copies of completed requisition form and demographic sheet into back pouch of Specimen Transport Bag;

- Pack shipment box in order shown, with Specimen Transport Bags sandwiched between refrigerant gel;

- Affix Singulex FedEx Airbill.

191.    Relator Webster has observed that Dr. Miller does not perform or pay for (by having his staff perform them) processing services for Singulex blood samples as described as physician responsibilities in the "Agreement for Singulex Clinical Lab Cardiovascular Testing". Since approximately spring of 2011, LabCorp has provided all of the blood draw services, and

44

virtually all of the processing services for tests on patients referred by Dr. Miller to Singulex.

192.    Dr. Miller's staff has minimal involvement in handling Singulex blood samples: assignment of labels to the vials; packing of specimens into the Singulex shipping kits provided to the practice; fold and place copies of completed requisition form and demographic sheet into back pouch of Specimen Transport Bag; and place the blood samples in Singulex's shipment box.  It is not necessary for Dr. Miller to label the shipment package because Singulex provides prepaid, labeled FedEx boxes.  In addition, the Singulex packages are picked up daily, so there is no need to schedule the pickup.

193.    The LabCorp representative performs most of the blood processing tasks listed as Dr. Miller's responsibilities in the "Agreement for Singulex Clinical Lab Cardiovascular Testing" and described in Singulex's processing instructions for referring physicians: the phlebotomy draw; allocation of specimens into multiple vials per Singulex Specimen Collection Instructions; invert 4-5 times; centrifuge for 15 minutes at 3000 RPM; place tube into front pouch of Specimen Transport Bag; and refrigerate.

194.    In contrast to the Singulex processing agreement and product literature, Dr. Miller receives Singulex's $10.00 fee per patient referral, but neither he nor his staff performs substantive blood processing services. Rather, the LabCorp technician in Dr. Miller's office performs the majority nearly all of the processing services on blood samples referred to Singulex.

### 6.    CMS Pays for Blood Draws, But Not  "Processing" Services

195.    Government healthcare programs, such as Medicare and Medicaid, reimburse physicians or laboratories only if their staff actually performs the blood draw (venipuncture). Thus, if Dr. Miller actually preformed the blood draw, his fee would be $3.00.  Because Dr. Miller does not perform the phlebotomy draw for HDL and Singulex tests, he is not entitled to a

fee for blood collection.

196.    Likewise, an independent laboratory, such as LabCorp may bill for the venipuncture (blood draws) performed for Dr. Miller's patients. Even then, the Medicare reimbursement for LabCorp would be $3.00, which is significantly less than the $20.00 HDL pays physicians for minimum "processing" services.

197.    Where Defendant LabCorp performs the blood draw, it may only bill Government healthcare programs, including Medicare, for the venipuncture (blood draws).  LabCorp would receive only one blood draw fee of $3.00, even though it draws samples for LabCorp, HDL, and Singulex from a given patient.

198.    Government healthcare programs such as Medicare do not reimburse physicians or laboratories for "processing" services for blood samples sent to laboratories.  Where one laboratory (LabCorp) draws blood for another laboratory (HDL or Singulex), routine processing (handling) charges are not reimbursable services under Government healthcare programs. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 60.1.2.

199.    Defendant LabCorp provides both blood draws and blood processing services for Dr. Miller's patients referred to HDL for testing. Medicare does not reimburse LabCorp for "processing" services on blood samples sent to HDL. Relators do not believe that Dr. Miller or HDL pays LabCorp to perform the "processing" services.

200.    Instead, LabCorp performs the majority of processing services for HDL samples, but HDL pays the $20.00 per patient "processing" fee directly to the referring physician, Dr. Miller.

201.    Relators also believe that there is an arrangement between HDL and LabCorp regarding the draw fees for patients referred to HDL. Relators have reviewed LabCorp reports

for beneficiaries of Government healthcare programs, including Medicare and TRICARE, which contain the computer printed notation: "Draw Fee to HDL." HDL is not entitled to reimbursement for the blood draw under Government programs because LabCorp, not HDL, performed the blood draw.

202.    Singulex pays draw fees to referring physicians who do not perform the venipuncture. The Singulex agreement states that Dr. Miller or his staff is supposed to perform both the blood draw and the blood processing services in exchange for the $10.00 processing fee. Defendant LabCorp, not Dr. Miller, performs the blood draw services. Thus, Dr. Miller is not entitled to the portion of the Singulex fee for the blood collection.

203.    Similarly, Government healthcare programs reimburse physicians only if their staff actually performs the blood draw (venipuncture).  Even then, the Medicare reimbursement is $3.00, which is less than one third of the $10.00 payment by Singulex to Dr. Miller.

204.    Even if Dr. Miller's staff did perform the blood processing services for patients referred to Singulex, the $10.00 payment by Singulex far exceeds fair market value for these services. The Singulex payments are also directly related to patient referrals.

205.    Medicare does not pay for routine handling charges where a specimen is referred by one laboratory to another. Medicare Claims Processing Manual, Chapter 16 - Laboratory Services, Section 60.1.2 - Independent Laboratory Specimen Drawing, (Rev. 1, 10-01-03).

206.    Government healthcare programs do not reimburse for services such as refrigeration, processing, and shipping which have only minimal value.  A LabCorp representative recently demanded a $5.00 fee per patient to draw blood and process blood samples for both HDL _and_ Singulex tests.  Thus, the fair market value of the processing services related to Singulex tests alone is, at best, $2.50.

47

207.    Singulex's practice of offering and paying Dr. Miller an inducement of $10.00 per patient referral continues today.

### 7.    HDL and Singulex Arrangements with Dr. Miller Violate AKS

208.    HDL and Singulex fail to meet any of the Safe Harbors to the AKS.

209.    HDL and Singulex do not meet the requirements of the personal services exception to the AKS, 42 CFR § 1001.952 (d), which requires that HDL and Singulex meet all seven of the following elements:

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a fulltime basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State

48

or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

210.    The arrangements between HDL, Singulex, and Dr. Miller fail at least two of the requirements of 42 C.F.R. § 1001.952 (d)(5). Payments by HDL and Singulex far exceed fair market value. In addition, payments by HDL and Singulex are "determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs."

211.    HDL and Singulex keep careful records of both the patients referred and the inducements paid to each physician, including Dr. Miller.  Under the guise of "processing fees" paid in exchange for the referrals, HDL and Singulex continue to violate federal and state anti-kickback laws by paying physicians, including Dr. Miller, for patient referrals.

**D.      Defendant LabCorp Gives Dr. Miller Free Lab Services for Referrals**

212.    For most of Relator Webster's employment, Dr. Miller's staff did not perform either the venipuncture (blood draws) or processing services for blood drawn in Dr. Miller's office when patients were referred for clinical laboratory testing.

213.    On the very rare occasion when Dr. Miller's staff would perform blood draws (venipuncture) and processing services for his patients, Dr. Miller's practice would bill Government healthcare programs only for the venipuncture using HCPCS Code 36415. The 2012 Medicare reimbursement for the professional fee for a blood draw is $3.00 per patient, irrespective of the number of samples (vials) drawn. Dr. Miller was not entitled to seek reimbursement for processing services from Medicare.

49

214.    The vast majority of the time, Dr. Miller has used a variety of independent laboratories to perform blood draws and processing services in his office for patients he referred for clinical laboratory testing. From approximately late 2008 until September 2010, Dr. Miller's blood draws and processing services were performed by Executor Diagnostics, LLC. For the last couple of months of 2010 until January 2011, Spectrum Laboratory Network did blood draws and processing for Dr. Miller's patients. In early 2011, Solstas Lab Partners briefly performed lab technician services.

215.    Relators believe that Defendant LabCorp began providing free lab services (blood draws and processing services) in Dr. Miller's office in spring 2011.

### 1.    HDL, Singulex, and LabCorp

216.    After BlueWave, Carnaggio, and Dent began marketing HDL's services, Dr. Miller switched from Berkeley to HDL (at the end of 2009 or the very beginning of 2010). From 2010 until September 2011, HDL and Singulex supplied Dr. Miller's office with a centrifuge. This centrifuge was used by the lab companies Dr. Miller used during that time period, including Executor, Solstas, and LabCorp.

217.    In early 2011, LabCorp installed its own lab technician, Carletha Harris, in Dr. Miller's office. Since then, LabCorp has provided Dr. Miller with free blood draw and blood sample processing services for all referrals for clinical laboratory testing, including referrals to HDL and Singulex, as well as to LabCorp.

218.    A recent LabCorp advertisement for a Patient Service Technician Specialist ("PST"), or phlebotomist, in the Charlotte, NC area includes the following requirements for Harris' position: phlebotomy certification; completion of an approved phlebotomy training course; 2 years of experience as a patient service technician/phlebotomist; and proficiency in blood collection by venipuncture and urine collection; and use of LabCorp's technology

50

(including "electronic reporting"). LabCorp's PSTs perform blood collection and processing, as well as packing and shipping of specimens.

219.    Harris is paid by LabCorp to perform blood draws and to process blood samples for patients referred by Dr. Miller to Defendant LabCorp, HDL, and Singulex.

220.    Harris has worked in this capacity for several years. When Dr. Miller changed office locations on October 3, 2011. LabCorp technician Harris and her equipment moved with Dr. Miller to his new practice location. LabCorp had always provided the following blood draw equipment to Dr. Miller's office (before and after the move): draw chair; LabCorp computer; copier; refrigerator; and blood draw supplies (needles, butterfly bandages, alcohol pads, etc.). When Dr. Miller moved his practice, LabCorp also supplied Dr. Miller's office with a centrifuge.

221.    While the mere placement of the LabCorp technician in Dr. Miller's office would not, according to the HHS-OIG Fraud Alert, serve as an inducement prohibited by anti-kickback statutes, the AKS is implicated when Defendant LabCorp's technician performs tasks that are the responsibility of the physician or his staff.

222.    Here, according to HDL and Singulex arrangements and literature, HDL and Singulex pay Dr. Miller handsomely to perform "processing services" for blood samples drawn on patients referred to HDL and Singulex for testing. These HDL and Singulex processing services are purportedly the responsibility of Dr. Miller's staff. In reality, LabCorp pays Harris to perform nearly 100% of the processing services for all patient blood samples, including those destined for HDL and Singulex laboratories. This scheme to provide free processing services to Dr. Miller implicates federal and state anti-kickback laws.

223.    HDL and Singulex are aware of and encourage this improper arrangement between Dr. Miller and LabCorp as it aids their business model, which requires that blood is

51

drawn in the physician's office in order to create the illusion that the kickback payments are fees to compensate the physician for blood draw and "processing" services.

### 2. LabCorp's Free "Processing" Services for HDL and Singulex Tests

224. Since 2011, Defendant LabCorp has provided blood draw and processing services for Dr. Miller's physicians' patients referred to HDL and Singulex.

225. Each time Dr. Miller refers a patient for HDL and Singulex testing, he also refers the patient to LabCorp for additional tests. Dr. Miller also refers patients to LabCorp outside of HDL and Singulex testing episodes.

226. Defendant LabCorp never charged or attempted to charge Dr. Miller for performing either blood draws or blood processing services for patients referred to HDL or Singulex until sometime in 2012.

227. Relators allege upon information and belief that LabCorp has provided free blood draw and processing services to Dr. Miller's patients who were referred to HDL and Singulex in exchange for referrals to LabCorp.

### 3. LabCorp Demands A Fee If Dr. Miller Does Not Refer To LabCorp

228. Sometime in 2011 or 2012, Jason Erxleben, Key Account Executive, became the LabCorp marketing representative responsible for sales to physicians in the Florence, SC area, where Dr. Miller's office is located.

229. Since that time, Mr. Erxleben has provided ongoing customer service to LabCorp customer, Dr. Miller.

230. In that capacity, Mr. Erxleben last visited Dr. Miller's office during September 2012.

231. Before September of 2012, Mr. Erxleben provided lunch for Dr. Miller and his staff. At that time, he requested that Dr. Miller refer patients to LabCorp for a Lipid Cascade

and not to HDL for a lipid panel.

232.    In September of 2012, Dr. Miller told Erxleben that he refused to stop referring patients to HDL for the lipid panel.  Erxleben then informed Dr. Miller and/or Dr. Miller's office manager that LabCorp wanted to charge Dr. Miller a $5.00 fee, per patient.  Erxleben made it clear that LabCorp was willing to continue to provide Dr. Miller with free blood draw and processing services for referrals to HDL and Singulex as long as Defendant LabCorp also received referrals from Dr. Miller for lipid testing.

233.    Relators believe that Defendant LabCorp had access to and tracked Dr. Miller's referral data, including testing referrals to HDL and Singulex, as Harris, the LabCorp technician, receives Dr. Miller's LabCorp requisitions which tell precisely which tests are referred to LabCorp, HDL, and Singulex. It is clear from Mr. Erxleben's statement that, even though he is not present to review each paper requisition or to observe all blood drawn and processed for referrals to LabCorp, HDL, and Singulex, he obtained Dr. Miller's referral information for HDL and Singulex, as well as LabCorp.

234.    LabCorp's key account executive, Erxleben, used referral data to enforce LabCorp's quid pro quo (free lab technician services for HDL and Singulex specimens in exchange for referrals to LabCorp).

235.    As stated above, the agreement between BlueWave and Singulex authorizes BlueWave to pay independent lab companies, such as LabCorp, to draw or process blood samples for Singulex. However, Relators do not believe that BlueWave pays independent lab companies, such as LabCorp, to draw or process blood samples for patients Dr. Miller refers to Singulex.

236.    Relators allege upon information and belief that BlueWave has an agreement with

HDL which, like the agreement with Singulex, authorizes BlueWave to pay independent lab companies, such as LabCorp, to draw or process blood samples for HDL. However, Relators do not believe that BlueWave pays independent lab companies, such as LabCorp, to draw or process blood samples for patients Dr. Miller refers to HDL.

237.    To the contrary, LabCorp appears to pay the draw fee to HDL. LabCorp reports for many of Dr. Miller's patients whose blood was drawn on December 10 and December 11, 2012 contain the following notation in the "additional information" section: "DRAW FEE TO HDL." These patients' blood samples were drawn while the regular LabCorp technician, Harris, was on vacation.

238.    Relators believe for the first day and a half (December 10 and half of December 11, 2012), the replacement LabCorp technician noted in the LabCorp computer that the draw fee for these patients was to go to HDL. These documents support the conclusion that LabCorp and HDL have an arrangement regarding draw fees for patients referred to LabCorp by physicians, such as Dr. Miller, who refer patients to HDL as a result of HDL's inducements.

239.    While LabCorp may be entitled to compensation for the blood draws by billing Government healthcare programs, HDL which does not perform the blood draws, is not.

### 4.    LabCorp's Inducement to Dr. Miller Causes Unnecessary (Duplicative) Testing

240.    Dr. Miller regularly referred patients to LabCorp for tests that are in part duplicative of the testing services he referred to HDL. For example, on November 6, 2012, Dr. Miller referred patient B.B. to HDL for, among other things, a lipid-panel test that included tests for Total Cholesterol, LDL-Cholesterol, HDL-cholesterol and Triglycerides. Dr. Miller also referred B.B. to LabCorp for the same tests on the same day. Dr. Miller refers patients to HDL and to LabCorp for duplicative tests as a standard practice.

241.    LabCorp received referrals from Dr. Miller for tests for the following patients who are beneficiaries of Government Healthcare Programs that are duplicative of referrals to HDL:

| Patient | Insurance | Date of LabCorp Report | Date of HDL Report |
|---------|-----------|------------------------|--------------------|
| DDF | Medicare, Medicaid | 5/5/2011 | 5/13/2011 |
| EAD | Medicare, Medicaid | 8/8/2011 | 8/11/2011 |
| LB | Medicare, TRICARE | 12/13/2012 | 12/22/2012 |

242.    Relators allege upon information and belief, that LabCorp has provided free blood draw and processing services to Dr. Miller, at least in part, in exchange for Dr. Miller's referrals to LabCorp of tests that are in part duplicative of laboratory testing referred to HDL.

### 5.        LabCorp Knows Its Tests Are Duplicative

243.    To have the LabCorp technician draw all of the blood samples for each patient, Dr. Miller writes all of the clinical laboratory tests for his patients on the LabCorp requisition form.  The LabCorp requisition has a space marked "other" where Dr. Miller or his staff hand write "HDL/Singulex."

244.    For example, the LabCorp requisition for Dr. Miller's patient, LB, a Medicare (primary) and TRICARE (secondary) beneficiary, includes the referral for "other" tests, "HDL/Singulex."  The same LabCorp requisition also includes referrals to LabCorp for a lipid panel that is duplicative of one performed by HDL.

245.    LabCorp knows when tests ordered by Dr. Miller and selected on the LabCorp requisition are duplicative of tests referred to HDL because the LabCorp requisition clearly shows both HDL and Singulex referrals, plus a number of referrals for LabCorp testing.

246.    The LabCorp technician draws blood for all of the laboratory testing, including

HDL, Singulex, and LabCorp. Based on the technical knowledge and experience required for LabCorp phlebotomists, the LabCorp employee knew or should have known when tests referred to LabCorp by Dr. Miller are duplicative of tests referred to HDL.

247.    Defendant LabCorp also provided a computer to their technicians, including Carletha Harris, the LabCorp employee/technician who performs blood draws and processing at Dr. Miller's office.   Relators believe that Defendant LabCorp tracks whether the patient is referred to LabCorp, HDL, or Singulex through computer entries by the lab technician.

**E.    LabCorp's Free Services Facilitate the HDL and Singulex Fraud**

248.    LabCorp provided free blood draws and processing services as an inducement for Dr. Miller's referrals, but it also facilitated the scheme by HDL and Singulex to pay inducements to Dr. Miller.

249.    LabCorp received the requisitions (referrals) for HDL and Singulex testing. LabCorp knew that Dr. Miller's staff was not performing blood draws and processing services for the HDL and Singulex referrals. Without LabCorp's free blood draw and processing services, the value of the inducements paid by HDL and Singulex to referring physician Miller would be reduced. For physicians who refer patients to HDL and Singulex, physically getting blood samples to HDL and Singulex is more difficult without LabCorp's assistance in providing free blood draws and processing services.

250.    At least one purpose of the free phlebotomist services provided by Defendant LabCorp to Dr. Miller, who also refers his patients to HDL and Singulex, is to induce Dr. Miller to refer patients to LabCorp for clinical laboratory testing.

**F.    HDL, Singulex, and LabCorp Offer Significant Remuneration (In Cash and In Kind) to Physicians for Referrals**

251.    HDL and Singulex created and maintained records of the illegal inducements they

paid to Dr. Miller. In particular, HDL and Singulex recorded on a "Draw Log" for each patient referred by Dr. Miller, the name of the patient, the date of birth, the date of the referral, and payment to Dr. Miller for the referral.  Singulex has very recently changed the name of the referral log to "Process and Handling" log.

252.    Relators have reviewed lists of many of the patients Dr. Miller referred to HDL and Singulex, as well as documents, including checks, showing substantial cash payments made by HDL and Singulex to Dr. Miller for patient referrals.

1.    **HDL Kickbacks: $130,000-Plus**

253.    Relator Lutz has reviewed many referral logs for patients referred by Dr. Miller to HDL between 2010 and 2012.  Each HDL referral log contains multiple sheets of tables detailing patients Miller referred for HDL testing.

254.    For example, between August 10, 2010 and May 19, 2011, Dr. Miller referred 1,611 patients to HDL.  In exchange, HDL paid remuneration (kickbacks) to doctor Miller, at $20 per patient, for a total of $32,220.00 in just a 9-month period.

255.    Since January 2010, based upon Dr. Miller's referral history, Relators estimate, based on 185 referrals per month, that HDL's kickback payments to doctor Miller, at $20 per patient referred, exceed $133,000.  Recently, Dr. Miller has referred more than 200 patients per month to HDL.

2.    **Singulex Kickbacks: $55,000-Plus**

256.    Relator Lutz also reviewed the referral logs for patients referred by Dr. Miller to Singulex.

257.    During the same nine-month period (between August 10, 2010 and May 19, 2011), and based on Dr. Miller's practices, Dr. Miller referred 1,611 patients to Singulex. In exchange, the remuneration Singulex paid Dr. Miller, at $10 per patient, was $16,110.00.

258.    Relators estimate that, based on 185 patient referrals per month, since July 2010, Singulex paid remuneration (kickbacks) to Dr. Miller, at $10 per patient referred, in excess of $55,000.  Recently, Dr. Miller has referred more than 200 patients per month to Singulex.

### 3.    LabCorp Kickbacks: Full Time Phlebotomist Salary

259.    In addition to the cash remuneration provided by HDL and Singulex, Defendant LabCorp provides referring physicians with free blood draw and processing services.  At a minimum, Relators believe that the value of this "in-kind" remuneration to physicians such as Dr. Miller is measured by LabCorp's cost for the phlebotomist's full-time salary, plus benefits.

260.    In the alternative, LabCorp contracts provide for payment for phlebotomy charges according to a fee schedule. The 2011 LabCorp fee schedule indicates that LabCorp charges $5.25 for venipuncture, and $24.00 per hour for phlebotomist services (in addition to the draw fee) where more than 72 hours notice is provided and the services are not regularly scheduled.

### G.    HDL, Singulex and BlueWave National Scheme: Inducing Referrals for Lab Tests

### 1.    BlueWave's Founders Deliver the HDL and Singulex Promotions: Fees for Patient Referrals

### a.    The National Scope of HDL's Scheme

261.    Upon information and belief, before their January 1, 2010 departure from Berkeley, the founders of BlueWave (Dent and Johnson) and HDL collaborated to develop a nationwide marketing program for HDL.

262.    Relators allege upon information and belief, that HDL's offer of $20.00 processing fees to referring physicians was approved by HDL as part of the marketing program delivered by BlueWave to all potential HDL customers nationwide.

263.    HDL's product manual is called the "In Service Guide for Lab Partners" in recognition of the physicians who "partner" with HDL through compensation arrangements.

264.    Upon information and belief, BlueWave's sales representatives offered the same cash inducements to many physicians (in addition to Dr. Miller) to induce them to refer patients to HDL for laboratory testing.  For example, Relators allege upon information and belief that many physicians in North Carolina, South Carolina, and Georgia received the same promotional offer, namely HDL's offer of inducements that BlueWave made to Dr. Miller.

265.    In the fall of 2012, Blue Wave's Dent and Carnaggio provided Dr. Miller with HDL's marketing materials for the EarlyCDT-Lung test, including a page of suggested ICD-9 codes. These same marketing HDL marketing materials and suggested ICD-9 codes for HDL's lung test are distributed by HDL representatives from Florida to Pennsylvania.

266.    As stated above, Kyle J. Martel, one of the original BlueWave sales representatives, began promoting HDL and Singulex products in Florida in 2010.

267.    In 2012, Martel and Charles A. Maimone, Jr. formed "C&K Healthcare Consultants."  Maimone, who is based in New Jersey, is listed as the HDL representative on a sample HDL new customer form that was recently provided to a physician practice in Pennsylvania.  HDL's new customer form was last revised in 2010.

268.    Relators believe, and therefore aver, that Maimone promotes HDL and Singulex products in New Jersey and/or Pennsylvania, and that he uses the same marketing materials and offers the same inducements that BlueWave, HDL, and Singulex have been promoting since 2010.

269.    Relators allege upon information and belief, that HDL's national marketing practices, as promoted by BlueWave, resulted in many physicians (in addition to Dr. Miller) receiving a $20.00 per patient "processing services" fee each time a patient is referred to HDL.

270.    Relators allege upon information and belief that, utilizing this model, BlueWave

and HDL implemented a marketing program which resulted in illegal inducements being paid to referring physicians in all of the 45 states where HDL operates.

271.    The national scope of HDL's inducement scheme is also supported by HDL's CEO, who has stated that HDL's business practices include obtaining W-9 forms from physicians as they become new customers.  This W-9 form is necessary for HDL to issue 1099 forms reflecting the compensation arrangement that HDL has with many physicians throughout the United States.  HDL pays physicians nationwide for "processing services."

### b.    HDL Induced Physicians to Switch Overnight

272.    As former sales representatives for HDL's competitor, Berkeley, BlueWave's original sales representatives would have access to information regarding physicians with robust practices and valuable referrals. For example, at the end of 2009, Dr. Miller was the number one prescriber of Berkeley tests in Dent's sales territory, which included North Carolina, South Carolina and Georgia.

273.    Just one week into 2010, after BlueWave (through its founder Dent, and Carnaggio) began promoting HDL testing, Dr. Miller stopped referring patients to Berkeley and started referring patients to HDL. Thereafter, HDL started paying Dr. Miller a $20.00 per patient referral.

274.    Relators allege upon information and belief Dr. Miller is only one of many former Berkeley customers who switched their referrals to HDL after BlueWave started promoting HDL clinical laboratory testing services. Relators further allege upon information and belief that, after they changed referrals to HDL, many other physicians received HDL's $20.00 per patient fee for "processing services."

275.    HDL's practice of offering and paying a $20.00 per patient inducement to Dr. Miller continues today. HDL's practice of offering and paying a $20.00 per patient inducement

to other referring physicians is also ongoing.

       **H.**     **BlueWave Delivers Singulex Offers of "Processing Fees"**

     276.    In June 2010, BlueWave (through its founder Dent and Johnson, and sales representative Carnaggio) began promoting Singulex testing. By July 2010, Dr. Miller was referring nearly every patient to Singulex. Thereafter, Singulex started paying Dr. Miller a $10.00 per patient fee. Singulex refers to these as fees for "processing services."

     277.    Relators also allege upon information and belief, that BlueWave facilitated an offer by Singulex to pay Dr. Miller a $10.00 fee for each patient referred.

     278.    Relators allege upon information and belief that BlueWave's founders carried out promotional programs with Dr. Miller that were vetted and approved by Singulex for delivery to all potential Singulex customers in all states covered by Singulex and BlueWave promotional agreements.

     279.    Relators allege upon information and belief that, since June of 2010, Singulex and BlueWave have used the same marketing practices throughout BlueWave's sales territories that they employed with Dr. Miller in order to induce many physician customers to refer their patients to Singulex.

     280.    Singulex's practice of offering and paying a $10.00 per patient inducement to referring physicians throughout the country, including Dr. Miller, continues to today.

        **1.**     **BlueWave and HDL Grab Physician Referrals in Many States**

     281.    The sales territory served by BlueWave's sales representatives Carnaggio and Dent while they worked at Berkeley, HDL's competitor, was North Carolina, South Carolina, and Georgia.

     282.    Since January 2010, BlueWave, its principals, and agents have marketed HDL testing services in many states, including: North Carolina, South Carolina, Georgia, Florida,

California, Colorado, Louisiana, Missouri, Mississippi, New Jersey, New York, Texas, Tennessee, Virginia and Wisconsin.

283.    In addition to Dr. Miller, many former Berkeley physician customers from across the United States stopped referring patients to Berkeley after BlueWave started promoting HDL testing. These physicians include: Dr. Thomas L. Jeffries of Raleigh, NC; Dr. Gerald M. Kovar of Tarzana, CA; Dr. Michael Rosemore of Hueytown, AL; and Dr. James Mensone of Greenville, SC.

284.    BlueWave, Dent, Johnson, and HDL have promoted HDL products to former Berkeley physician customers in the following states: Alabama, California; Colorado; Florida; Kansas; Louisiana; Missouri; Mississippi; New Jersey; South Carolina; Texas; and Virginia.

285.    HDL's national promotional program has included offering potential physician customers "processing fees" for each patient referred to HDL.

286.    Upon information and belief BlueWave's sales representatives offered the same cash inducements they offered to Dr. Miller to many physicians across the United States, including former customers of Berkeley as well as new targets, to induce them to refer patients to HDL for laboratory testing.

287.    Relators allege upon information and belief that since at least January of 2010, like Dr. Miller, many physicians throughout the United States refer patients to HDL and have accepted HDL's offer of bogus "processing fees" in exchange for each patient referral to HDL.

288.    Upon information and belief, since at least January 2010, HDL has made monthly processing services payments to many, if not all, of its referring physicians.   HDL pays the referring physician $20.00 each time a patient is referred for HDL testing.

289.    HDL reports that it serves 10,000 physicians. Dr. Miller, one of the first

customers to switch from Berkeley to HDL, is identified on HDL's inducement checks as HDL Customer No. 041. Relators allege upon information and belief that many HDL physician customers receive similar inducement checks ($20.00 per patient referral), signed by Mallory, from HDL.

                **a.**      **BlueWave Markets Singulex Inducements in Many States**

290. Upon information and belief, around June 2010, BlueWave and Singulex developed a program for marketing Singulex's testing services in all states covered by Singulex and BlueWave marketing agreements.

291. Since June 2010, BlueWave has had the exclusive right to market Singulex laboratory testing services in ever-expanding geographic areas. For example, since June 2010, BlueWave has had the exclusive contract to market Singulex testing in North Carolina, South Carolina, Georgia, and in other areas across the United States.

292. Dr. Miller is one of many physicians in BlueWave's Singulex territory. Based on the marketing of BlueWave's representatives, Dr. Miller began to refer patients to Singulex in mid-2010.

293. Thereafter, Singulex began making significant monthly cash payments to Dr. Miller. Singulex called these payments "draw fees," which were calculated at $10.00 each time Dr. Miller referred a patient to Singulex.

294. As stated above, Martel, one of the original BlueWave sales representatives, promotes HDL and Singulex products in Florida. Martel's partner in C&K Healthcare Consultants, Maimone, is based in New Jersey. HDL and Singulex promotional materials identifying Maimone as the sales representative were recently provided to a physician practice in Pennsylvania. These materials included the Singulex new customer form. Singulex has provided a space on the new customer form for the sales representative to request a 1099 for the new

physician.

295.    Upon information and belief, the inclusion of the 1099 form request on the Singulex new customer form supports the conclusion that Singulex pays process and handling fees to referring physicians with great frequency, and that Singulex marketing agents offer these process and handling arrangements to prospective new customers in exchange for patient referrals.

296.    Relators allege upon information and belief that many physicians in North Carolina, South Carolina, Georgia, and other states received the same promotional offer from BlueWave that was made to Dr. Miller.

297.    Relators allege upon information and belief that the marketing program vetted and approved by Singulex and its former CEO, Goix, for potential customers in all states covered by Singulex and BlueWave marketing agreements included Singulex's offer of a $10.00 inducement for each patient referral.

298.    Upon information and belief, BlueWave's sales representatives conveyed to physicians across the country Singulex's offer to pay the physician cash remuneration of $10.00 each time the physician referred a patient to Singulex for laboratory testing.

299.    For example, Brad Johnson, President of BlueWave, and an equity owner of Singulex, marketed Singulex products to many physicians in Alabama. Relators allege upon information and belief that Johnson and Dent (as co-founders and executives of BlueWave) would deliver only marketing programs vetted with and approved by their client, Singulex.

300.    Relators allege upon information and belief that since at least June of 2010, many referring physicians throughout the United States (in addition to Dr. Miller) have accepted Singulex's offer of illegal remuneration.

301.    Relators allege upon information and belief that Singulex has received referrals from physicians (in addition to Dr. Miller) receiving bogus "processing fees" from Singulex. Relators further allege upon information and belief that Singulex has submitted claims for these tainted and unnecessary laboratory testing services to Government healthcare programs.

302.    Upon information and belief, physicians in many states who refer patients to HDL and Singulex receive substantial remuneration from HDL and Singulex based on national marketing schemes vetted and approved by HDL and Singulex and carried out by BlueWave. These marketing schemes have resulted in HDL and Singulex submitting many claims for tainted and unnecessary laboratory testing services to Government healthcare programs.

303.    Johnson, BlueWave's co-founder, has described his target physician customer as "early adopters, cutting edge physicians, draw their own blood, have the ability to draw their own blood, money hungry," smaller practices.

304.    Since 2010, HDL and Singulex have focused on physicians with the capacity to draw their own blood.  In fact, the new customer sheets for both HDL and Singulex focus on whether the physician draws blood for patients in his or her office.

305.    Relators allege upon information and belief that BlueWave targets physicians who have the ability to have patient blood drawn in their offices (as opposed to a hospital lab or other outside laboratory) because if the patient is sent to a lab outside the doctor's office, all of the "processing" would be done there.  HDL and Singulex would then have no justification for the bogus "processing fees" they pay to physicians to induce referrals.

### 2.    False Records to Get False or Fraudulent Claims Paid: Singulex and HDL "Processing" Agreements with Referring Physicians

306.    Singulex has recently entered in a written agreement with Dr. Miller titled "Agreement for Singulex Clinical Lab Cardiovascular Testing." Relators believe that this is the

first time that Singulex has put in writing its $10.00 per patient compensation arrangement with Dr. Miller.

307.     Based on statements by HDL's CEO, Mallory, that HDL has compensation arrangements to pay referring physicians "processing fees," Relators believe, and therefore aver, that HDL has also created written agreements with referring physicians, including Dr. Miller.

308.     Upon information and belief, HDL and Singulex enter into written agreements like the Singulex "Agreement for Singulex Clinical Lab Cardiovascular Testing" with referring physicians nationwide.

309.     Compensation arrangements between HDL or Singulex and referring physicians purport to characterize remuneration paid by HDL and Singulex as "professional service fees" for "processing and handling" blood samples for patients referred to HDL and Singulex.

310.     In reality, Relators know that many referring physicians, such as Dr. Miller, do not perform the services for which they are ostensibly responsible according to the processing agreements with HDL and/or Singulex. Even if the physicians performed the "processing" services listed, the fair market value of the services is far less than the amounts paid by Singulex ($10.00) and by HDL ($20.00) for each patient referred.

311.     HDL, Mallory, Singulex, and Goix then submit or cause the submission of claims to the Government for these referred patients' laboratory tests, even if the services are unnecessary, duplicative, or worthless (*e.g.*, the patient has not fasted sufficiently prior to testing), and receive routinely payment worth hundreds of dollars in return.

312.     Upon information and belief, at no point in time have HDL, Mallory, Singulex, and Goix returned such payments to the Government as an overpayment.

313.     The agreements for "processing and handling" of blood samples created by or on

66

behalf of HDL and Singulex are false records because they purport to disguise fraudulent inducements as fair market compensation for bona fide physician services.

### 3.    National Scope of Independent Lab Inducements for Referrals

314.    LabCorp began to provide free lab services to Dr. Miller's office in early 2011, after HDL and Singulex began their nationwide schemes to offer physicians "processing fees" to induce referrals.

315.    BlueWave's founder, Brad Johnson, has highlighted the importance of in-office blood drawing services when BlueWave targets potential customers for HDL and Singulex.

316.    Physicians can have the capacity to provide their patients with in-office blood drawing services either by employing a lab technician as a member of the doctor's staff - or by obtaining lab technician services paid for by an independent laboratory.

317.    The new customer forms for both HDL and Singulex contain information regarding whether blood draws are performed in the doctor's office. BlueWave's, HDL's and Singulex's focus on physicians able to draw blood in their office adds to the fraudulent nature of their scheme. Government healthcare programs and private insurers reimburse laboratory testing that is medically necessary. Physicians can order only tests that are necessary for the treatment of Government healthcare program beneficiaries. It should not matter to the physician, or to the laboratory testing provider, whether the blood is drawn in the physician's office or at an outside lab.

318.    The location of the blood draw is, however, critical to HDL and Singulex because these tests are marketed as a revenue stream for the referring physician. For the stream of inducements to flow from HDL and Singulex, the blood draws and processing services for HDL and Singulex tests must be provided in the office of the doctor receiving the inducements so as to disguise the inducements as "processing" fees.

67

319.    If the patient leaves the doctor's office and has blood drawn at an outside lab, that lab would also perform the blood processing services. HDL and Singulex could not then pay the referring physician the bogus "processing" fee. Physicians must either employ a lab technician or obtain the services of a technician from an independent lab to benefit from the HDL and Singulex inducements.

320.    Relators also allege upon information and belief that independent laboratories such as LabCorp provide free laboratory-technician services and related equipment to many physicians (in addition to Dr. Miller) who refer patients to HDL and Singulex.

321.    Relators allege upon information and belief that at least one purpose for independent laboratories (such as Defendant LabCorp) to provide free laboratory technician services and related equipment to physicians receiving inducements from HDL and Singulex (such as Dr. Miller) is to induce these physicians to refer patients to independent laboratories for testing in addition to the tests to be performed by HDL and Singulex.

322.    To facilitate the fraud by HDL and Singulex, independent laboratories such as LabCorp provide referring physicians, including Dr. Miller, with free blood draw and processing services.

323.    Relators allege upon information and belief that independent laboratories (such as Defendant LabCorp), continue to provide free phlebotomy services to physicians nationwide who refer patients to HDL and Singulex, and who receive cash inducements from HDL and Singulex disguised as "processing" fees.  Relators further allege upon information and belief that independent laboratories (such as Defendant LabCorp) provide free blood processing in exchange for referrals to LabCorp.

324.    HDL, Singulex, BlueWave, Dent and Johnson, and independent laboratories (such

as Defendant LabCorp) conspire by engaging in illegal conduct which includes, but is not limited to, a carefully orchestrated scheme wherein HDL and Singulex offer and pay to physicians throughout the United States monetary remuneration (under the guise of "processing" fees) to refer beneficiaries of Government healthcare programs and private insurance plans for laboratory testing. Independent laboratories (such as Defendant LabCorp) provide free processing services for these same referring physicians in exchange for referrals to independent laboratories (such as Defendant LabCorp) for additional, and at times duplicative, laboratory testing.

325.    All of the claims for HDL, Singulex, and/or LabCorp testing performed for Government program beneficiaries as a result of referrals from physicians receiving inducements from HDL, Singulex, and/or LabCorp are tainted by federal AKS violations. These claims also violate the analogous state anti-kickback laws.

326.    In violation of federal and state anti-kickback laws, HDL, Singulex, and LabCorp tested beneficiaries and submitted claims to the Government healthcare programs based on illegally induced referrals. *See* Exhibit "A."

327.    Compliance with the federal AKS, and analogous state laws is a condition of payment by federal and state healthcare programs.  All of the claims submitted by HDL, Singulex, and/or LabCorp based on fraudulently obtained physician referrals also violate federal and state false claims acts.

328.    All of the testing performed by independent laboratories (in addition to Defendant LabCorp) for Government program beneficiaries as a result of referrals from physicians receiving inducements are tainted by AKS violations.  All of the claims submitted by independent laboratories (in addition to Defendant LabCorp) based on fraudulently obtained physician referrals also violate federal and state false claims acts.

329.    Relators allege upon information and belief that the business scheme by LabCorp, HDL, and Singulex results in systematic nationwide submissions of false claims to Government healthcare programs and private insurance plans for hundreds of millions of dollars in false claims for clinical laboratory tests tainted by anti-kickback violations, and other testing which was not medically necessary.

### 4.    LabCorp's, HDL's, and Singulex's Illegal Inducements Expose Patients to Harm

330.    The scheme by LabCorp, HDL, and Singulex also exposes beneficiaries of Government healthcare programs to significant physical and economic harm.

### a.    Physical Harm Caused by Tainted Laboratory Tests

331.    The scheme by LabCorp, HDL, and Singulex causes real suffering for patients who are the pawns at the center of their fraudulent conduct.  Exploited patients, most of whom are elderly Medicare beneficiaries, are subjected to painful and unnecessary needle sticks. Where the patient is referred for the full panel of HDL and Singulex testing, the lab requires eight to nine vials of the beneficiary's blood to perform these tests. These excessive and unnecessary blood draws are especially intolerable for elderly patients.

332.    Relator Webster has witnessed patients complaining of lightheadedness, loss of blood, and painful needle sticks resulting from the fraudulent testing scheme.

333.    The foreseeable effect of the LabCorp, HDL, and Singulex scheme, which follows from referrals initiated in response to their inducements, includes prescription medications. Physicians, including Dr. Miller, unnecessarily prescribe medications to justify HDL's, Singulex's and LabCorp's laboratory testing.

334.    At the time of the initial false diagnosis of high cholesterol, nearly every one of Dr. Miller's patients is prescribed cholesterol-lowering medications in order to both support the

diagnosis of high cholesterol and also to justify the referrals to HDL, Singulex and LabCorp.

335.    For example, Dr. Miller prescribed medications for the treatment of high cholesterol to almost all patients referred to HDL, Singulex and LabCorp.  These include Crestor (Rosuvastatin), which is manufactured by AstraZeneca.  Crestor can have serious side effects, including a muscle problem known as rhabdomyolysis, which can lead to kidney problems, and liver damage.  Patients may suffer severe muscle pain as a result of consuming the drug.

336.    In addition, Dr. Miller also prescribes Simcor for nearly every patient referred to HDL and Singulex. Simcor, which is manufactured by Abbott Labs, also has serious side effects, including rhabdomyolysis.  Statins like Simcor and Crestor put patients at risk for developing serious health conditions, including, but not limited to, diabetes and memory loss.

337.    Relator Webster has observed patients complaining of the ill effects of these medications.  In response, Dr. Miller advises the patients to continue taking medication.

338.    Relators believe that physicians who are offered HDL's and Singulex's inducements, and receive free services from Defendant LabCorp, initiate and maintain prescription drug therapy in part to justify referrals to HDL, Singulex and LabCorp that will result in ongoing cash remuneration for referring physicians.

**b.    Tainted Laboratory Tests Cause Economic Harm to Patients**

339.    To further its fraudulent scheme, some physicians, including Dr. Miller, make misrepresentations to patients that they suffer from medical conditions which require the HDL, Singulex, and LabCorp testing and/or medications to treat these conditions.

340.    Patients also suffer from the negative economic impact of inaccurate diagnoses of high cholesterol used to justify HDL's, Singulex's, and LabCorp's testing.  Other economic harm to patients includes: unnecessary follow-up appointments with physicians to review unnecessary lab results; co-payments for unnecessary prescription drugs; costs for care related to side effects

from unnecessary prescriptions; and increased insurance premiums related to increased testing, prescription usage, and related false diagnoses.

341.    For example, Relators are aware of patients who have been denied life insurance coverage because the patient has been falsely diagnosed with high cholesterol.  There are times when the patients referred to HDL, Singulex, and/or LabCorp are not even aware that they have been given this diagnosis. Patients have contacted Dr. Miller's office to complain about the fabricated high cholesterol diagnosis.  When this occurred, the office manager has changed the patient record to remove the fabricated diagnosis of high cholesterol and has written a letter to the insurance company stating that the patient was diagnosed with high cholesterol in error.

342.    In addition to prescriptions for cholesterol-lowering medications, Dr. Miller also prescribes Metanx #180, 1 tablet BID (twice a day), manufactured by PamLab, LLC. Dr. Miller tells patients that Metanx improves good cholesterol. However, the FDA-approved label states that Metanx is approved only for the narrow indication of diabetic neuropathy. PamLab provided Dr. Miller with pre-printed scrip pads and samples.  Dr. Miller prescribes PamLab products electronically.

343.    Metanx costs approximately $82.56 per month. The average cost for a patient in a state-funded program, *i.e.*, a participant in the South Carolina Employee Insurance Program, is $41.10 for a 30-day supply.

## IX.    The LabCorp, HDL, and Singulex Scheme Causes Government Healthcare Programs to Pay Millions of Dollars for Unnecessary, Useless, and Even Harmful Clinical Laboratory Testing

### A.    The Scheme to Submit or Cause the Submission of False Claims

344.    The LabCorp, HDL, and Singulex scheme of inducing physicians to refer patients to HDL, Singulex, and LabCorp for unnecessary clinical laboratory testing included, but was not limited to, the following conduct which is ongoing:

72

- BlueWave marketed the testing services of HDL and Singulex to referring physicians;

- In violation of state and federal false claims statutes, and federal and state anti-kickback laws, HDL offered physicians $20 for each patient referral to HDL;

- In violation of state and federal false claims statutes, and federal and state anti-kickback laws, Singulex offered physicians $10 for each patient referral to Singulex;

- In violation of state and federal false claims statutes, federal and state anti-kickback laws, physicians received and accepted offers of remuneration to refer patients to HDL, Singulex, and LabCorp for testing, even where testing was not medically necessary;

- In violation of state and federal false claims statutes, federal and state anti-kickback laws, Defendant LabCorp provided referring physicians, including Dr. Miller, with remuneration in the form of phlebotomist services to physicians in exchange for referrals to LabCorp for additional (and even duplicative) testing.

345.    In furtherance of their scheme, LabCorp's, HDL's, and Singulex's conduct included making or causing to be made or used false records or statements material to false or fraudulent claims, including, but not limited to:

- false records to create the appearance that cash remuneration paid by HDL and Singulex to physicians in exchange for patient referrals were for legal and appropriate professional services to be performed by referring physicians;

- false records to otherwise create the appearance that HDL's, Singulex's, and LabCorp's testing did not violate the AKS and/or was otherwise reimbursable by

73

government healthcare programs or private healthcare insurance companies;

- false requisitions for HDL, Singulex, and LabCorp testing that were material to false or fraudulent claims submitted to Medicare, Medicaid, and other Government healthcare programs and private insurers; and

- other false records or statements, including false patient records, material to false claims submitted to Medicare, Medicaid, and other Government healthcare programs and private payors.

346.    Relators believe that HDL, Singulex, and LabCorp utilized this scheme in every state across the country where HDL or Singulex pays physicians inducements to obtain fraudulent referrals of patients, including Government program beneficiaries, for laboratory testing services.

347.    Relators believe that Defendant LabCorp violates the federal AKS in every state across the country where LabCorp installs phlebotomists in physician offices for free in order to obtain fraudulent referrals of patients for laboratory testing services.

348.    Relators believe that LabCorp, HDL, and Singulex employed and/or have conspired to employ this scheme to submit false claims to federal and state healthcare programs including Medicare, Medicaid, CHAMPUS/TRICARE, and other federal and state healthcare programs.

349.    Each and every claim that was billed to a Government healthcare program, including Medicare and/or Medicaid, for a test performed on a patient referred to HDL, Singulex, or LabCorp by a physician who received cash inducements from HDL or Singulex, and who received other remuneration from LabCorp through free phlebotomist services, violates the federal and state false claims acts.

350.     Many of these testing services referred to HDL, Singulex, or LabCorp also violate federal and state false claims acts because the tests were not medically necessary, and therefore, not covered by Government healthcare programs.

351.     Relators believe that LabCorp, HDL, and Singulex employ and/or conspire to employ this scheme to submit false claims to private insurers in California and Illinois. LabCorp, HDL, and Singulex submitted claims for testing to commercial insurance companies including AETNA and Blue Cross.  Examples of Blue Cross patients who were referred to HDL and Singulex for testing are provided in Exhibits "B" and "C."

352.     Each and every claim that was billed to a private insurer in California or Illinois, or for a patient located in those states, for a test performed on a patient referred to HDL, Singulex, or LabCorp by a physician who received cash inducements from HDL or Singulex, and who received other remuneration from LabCorp through free phlebotomist services, violates the CIFPA and ILCFPA.

353.     Upon information and belief, many of these testing services referred to HDL, Singulex, or LabCorp also violate the conditions of payment by private insurance companies in California or Illinois because the tests they performed and billed for were not medically necessary, and therefore, not covered.

**B.      Damages to Government Healthcare Programs: Millions in Reimbursements**

354.     HDL, Singulex, and LabCorp derive a significant portion of their earnings from reimbursements for claims submitted to Government healthcare programs.

355.     Relators believe that the fraudulent conduct and illegal inducements described herein to referring physicians led to exponential growth in revenues for HDL and Singulex over the past two years.  For example, the marketing scheme employed by BlueWave and HDL successfully catapulted HDL to the forefront of cholesterol testing market.

356.    The payoff for these laboratories has been rapid and dramatic.

357.    For example, a single referring physician, such as Dr. Miller, has referred and continues to refer thousands of patients to HDL, Singulex, and LabCorp each year. Recently, Dr. Miller has referred more than 200 patients per month to HDL, Singulex, and LabCorp.

358.    Relators allege upon information and belief that a large percentage of patients referred for laboratory testing by physicians receiving inducements from HDL, Singulex, and LabCorp are beneficiaries of Government healthcare programs, including Medicare and TriCare. For example, between August 10, 2010 and September 8, 2010, of the 200 patients referred to HDL by Dr. Miller, 98 were Medicare beneficiaries (age 65 and over). Additional patients referred by Dr. Miller were beneficiaries of TRICARE/CHAMPUS, and other federal or state employees' health benefit programs.

### 1.    HDL Claims Average $1,400 Per Beneficiary, 3-4 Times a Year

359.    Relators allege upon information and belief that for each Government healthcare program beneficiary referred for testing by a physician receiving HDL's cash inducements, HDL submits a claim to federal and state healthcare programs for more than $1,400.00 per episode, and that HDL submitted claims for these expensive tests three to four times per year for every affected Medicare or Government beneficiary.

360.    Significantly, through Dr. Miller alone, HDL received 886 tainted referrals for laboratory testing between August 11, 2010 and December 30, 2010. Of the 886 claims HDL submitted for these patients, approximately 416 were for Medicare-eligible patients (aged 65 and older). More patients referred to HDL were beneficiaries of other federal and state healthcare programs, such as CHAMPUS/TRICARE and the state employees' health benefit program.

361.    A table summarizing some of the patients for whom claims submitted by HDL to Medicare and other Government payors is attached as Exhibit "B."

76

## 2. Singulex Reimbursements Average $300 Per Beneficiary Per Episode

362.    Relators allege upon information and belief that for each Government healthcare program beneficiary referred for testing by a physician receiving Singulex's cash inducements, Singulex submits a claim to federal and state healthcare programs for more than $300 per testing episode, and that Singulex submitted claims for these expensive tests three to four times per year for every affected Medicare or Government beneficiary.

363.    Significantly, through Dr. Miller alone, Relators believe, and therefore aver, that Singulex submitted 886 tainted claims for laboratory testing between August 11, 2010 and December 30, 2010. Of the 886 claims submitted, approximately 416 were for Medicare-eligible patients (aged 65 and older). Additional patients referred to Singulex by Dr. Miller were beneficiaries of other federal and state healthcare programs, such as CHAMPUS/TRICARE and the state employees' health benefit program.

364.    A table summarizing some of the patients for whom Singulex submitted claims to Medicare and other Government payors is attached as Exhibit "C."

## 3. LabCorp Reimbursements

365.    Relators also allege upon information and belief that physicians receiving inducements from HDL and Singulex also referred a significant number of patients to Defendant LabCorp in exchange for free phlebotomy services related to patients referred to HDL and Singulex.

366.    For example, Relators allege upon information and belief that since early 2011, Dr. Miller, a physician receiving HDL and Singulex inducements, has referred at least 3,700 patients to Defendant LabCorp.

367.    In addition to the 150 to 185 patients referred by Dr. Miller to HDL and Singulex each month, LabCorp also benefitted from its technician's presence in Dr. Miller's office

because other patients, including before and after HDL and Singulex testing episodes, would have blood drawn and tests performed by LabCorp.

368.    A significant number of the patients Dr. Miller referred to LabCorp were beneficiaries of federal and state healthcare programs.  Relators estimate that, conservatively, 47 percent of patients referred by Dr. Miller to LabCorp are state and federal healthcare program beneficiaries.

369.    In a study conducted in 2012, based on 2006 Medicare claims data, the most common laboratory code billed to Medicare was 36415 (venipuncture), which accounted for more than 106 million claims, or 16.1% of all Medicare Part B laboratory test claims. In 2006, Medicare paid out more than $337 million for blood-draw services.  In that same study, LabCorp was identified as one of the top two providers of lab services throughout the country.  Relators allege upon information and belief that the claims for venipuncture services LabCorp provides for patients referred to HDL and Singulex also involve substantial federal funds.

370.    Relators allege upon information and belief that for each Government healthcare program beneficiary referred for testing by a physician receiving LabCorp's inducements of free blood draws and processing services, LabCorp submits a claim to federal and state healthcare programs for both the blood draw and the LabCorp tests performed.

371.    Relators also allege upon information and belief that LabCorp billed the Government and that LabCorp was reimbursed for each patient referred by a physician offered LabCorp's inducements.  For example, Dr. Miller's patient, L.B., a Medicare (primary) and TRICARE (secondary) beneficiary, was referred for LabCorp testing on or about December 10, 2012.  LabCorp performed the blood draw and the testing and issued a lab report on December 13, 2012.  On information and belief, LabCorp later billed Medicare and/or TRICARE for the

blood draw and the tests.  Based on 2012 Medicare reimbursement rates for South Carolina, LabCorp received approximately $37.43 for performing a Basic Metabolic Panel, Lipid Panel and Hepatic Function Panel, the three most common tests that LabCorp performs for Dr. Miller's patients.  On this occasion, LabCorp also performed additional tests and received additional reimbursements.

372.    Relators also allege upon information and belief that Defendant LabCorp submitted claims for illegally induced tests multiple times per year for many beneficiaries of Medicare and other Government programs.

373.    Relators further allege upon information and belief that LabCorp's claims for venipuncture services provided on behalf of HDL and Singulex also involve substantial federal and governmental funds.

374.    A table summarizing an example of the claims submitted by Defendant LabCorp to Medicare and other Government payors is attached as Exhibit "D."

375.    Relators allege upon information and belief that HDL, Singulex, and LabCorp have not reported to Government healthcare programs that the testing performed on patients referred by physicians receiving financial inducements from HDL, Singulex, and LabCorp should not have been covered by Government healthcare programs. In addition, Relators believe, and therefore aver, that HDL, Singulex, and LabCorp have not repaid Government healthcare programs for reimbursements for testing which were fraudulently obtained through their elaborate scheme.

376.    The financial impact of the LabCorp, HDL, and Singulex fraudulent scheme on federal and state healthcare programs is significant.

377.    As conspirators, LabCorp, HDL, and Singulex are jointly and severally liable for

79

all damages arising out of their scheme. See, e.g. Miller v. Holzmann, 563 F. Supp. 2d. 54, 113 (D.D.C. 2008); Kelso v. Fed. Crop Ins. Corp., 724 F. Supp. 448, 453 (E.D. Tex. 1988). Relevant state false claims acts, including those of Florida and New Jersey, also hold LabCorp, HDL, and Singulex jointly and severally liable for damages arising out of their fraudulent conduct.

378.    Relators state upon information and belief that HDL, Singulex and LabCorp exercised the same fraudulent scheme as described herein against private insurers in California and Illinois.

379.    HDL and Singulex submitted claims for payment for tests they provided only as a result of an illegal kickback provided to the referring physician.

380.    Defendant LabCorp submitted claims for payment for tests it provided either as a result of the illegal kickback it provided to referring physicians in the form of free phlebotomy technician services or for services it provided as a result of HDL's and Singulex's blood draw needs.

381.    Relators allege upon information and belief that HDL, Singulex, and LabCorp neither reported to any private insurance plans covering patients in California or Illinois that they performed blood draw services and/or laboratory testing on patients referred to them by physicians to whom they were providing financial inducements nor that such claims should not have been covered by those insurance plans. In addition, Relators believe, and therefore aver, that HDL, Singulex, and LabCorp have not repaid any private insurer for reimbursements for testing that were fraudulently obtained through the elaborate scheme described herein.

**COUNT I**

**(UNITED STATES EX REL. LUTZ AND WEBSTER V LABCORP)**
**Violation of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(A), (B)  and (C)**

382.     Relators re-allege Paragraphs 1 through 381 as though fully set forth herein.

383.     Defendant violated the federal False Claims Act by submitting claims, or causing the submission of claims, for reimbursement from federal health care programs, including Medicare and Medicaid, knowing that they were ineligible for the payments demanded.

384.     Claims submitted, or that were caused to be submitted, by the Defendant LabCorp for clinical laboratory testing that violated the federal AKS constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

385.     Claims submitted, or that were caused to be submitted, by the Defendant LabCorp for clinical laboratory testing services that were unnecessary constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

386.     Claims submitted, or that were caused to be submitted, by the Defendant LabCorp for clinical laboratory testing services that were not appropriately provided or were useless constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

387.     Defendant LabCorp knowingly caused to be made or used false records or statements, material to false claims, including, but not limited to: false requisitions for laboratory testing by HDL, Singulex, or LabCorp; false certifications of medical necessity; false records of medical necessity; false processing services agreements between HDL or Singulex and referring physicians; false records related to inducements paid to referring physicians; all of which constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

388.    Defendant LabCorp, through its concerted efforts with HDL and Singulex to carry out HDL,  Singulex, and LabCorp's fraudulent schemes to bill Government healthcare programs for false claims for clinical laboratory testing, conspired with HDL and Singulex to defraud the federal government by getting false or fraudulent claims (including those related to unnecessary services, as well as those claims related to referrals tainted by violations of the federal Anti-Kickback Statute) allowed or paid by the government in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

**WHEREFORE**, Relators request the following relief:

A.    Defendant be ordered to cease and desist from submitting and/or causing the submission of any more false claims or in any way from otherwise violating the federal    False Claims Act,   31 U.S.C. §3729 *et seq.*

B.    That judgment be entered in favor of the Relators    and  the  United  States  and against Defendant in the amount of each and every false or fraudulent claim and so multiplied as provided by federal False Claims Act, 31 U.S.C. § 3729(a), plus a civil penalty of not less than Five Thousand Five Hundred ($5,500.00) Dollars nor more than Eleven Thousand ($11,000.00) Dollars per claim, as provided by 31 U.S.C. §3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant LabCorp and HDL and  Singulex  together with penalties for specific claims to be identified at trial after full discovery;

C.    Twenty five percent 25% of the proceeds of this action to the Relators if the United States elects to intervene, and 30% if it does not;

D.    That judgment be granted for the Relators and the    United  States  and  against Defendant for any costs, including, but not limited to, court costs, expert fees and all attorneys'

fees incurred by Relators in the prosecution of this suit;

      E.    That Defendant be enjoined from submitting, or causing to be submitted, further false claims to government healthcare programs and from attempting to collect monies for claims the Defendant has already submitted, or caused to be submitted; and

      F.    That Relators and the United States be entitled to     any and other relief that they are entitled to, whether by law or equity.

## COUNT II

**(UNITED STATES EX REL. LUTZ AND WEBSTER V LABCORP)**
**Violations of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

389.    Relators re-allege Paragraphs 1 through 388 as though fully set forth herein.

390.    Defendant LabCorp has received overpayments by Government healthcare programs for illegally-induced and/or medically unnecessary clinical laboratory testing that must be returned.

391.    Defendant LabCorp failed to report their submission of false claims for clinical laboratory testing to federal and state government healthcare programs or CMS, and Defendant LabCorp, also failed to return payments received from government healthcare programs based upon false claims or records.

392.    Defendant LabCorp was not entitled to receive payments from government healthcare programs based on claims that were false because: they violated federal Stark Laws; they contained false certifications of medical necessity; and/or they contained false certification and/or representations of compliance with federal statutes and regulations, including the federal AKS.

393.    Defendant LabCorp used false records to conceal amounts that it owed

government healthcare programs for payments based on unallowable claims and related charges for tainted and unnecessary clinical laboratory testing.

394.    As a result of Defendant LabCorp's failure to refund amounts owed to government healthcare programs, Defendant submitted false claims in order to avoid or decrease obligations to return overpayments of state and federal funds.

395.    The Patient Protection and Affordable Care Act (PPACA), 42 U.S.C. § 1128J(d), which Defendant LabCorp, and HDL and Singulex, have violated, requires that Defendant LabCorp self-report and return Government healthcare program overpayments within 60 days of identification.

396.    Defendant LabCorp knowingly caused to be made or used false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States, in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

**WHEREFORE**, Relators request the following relief:

A.    Judgment against Defendant for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of Eleven Thousand ($11,000.00) Dollars for each violation of the federal False Claims Act;

B.    25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, the costs of the audit, and other related expenses;

D.    Such other relief as the Court deems just and appropriate.

**COUNT III**

**(NORTH CAROLINA EX REL. LUTZ AND WEBSTER V LABCORP)**
**NORTH CAROLINA FALSE CLAIMS ACT**
**N.C. Gen. Stat. § 1-605 *et seq.***

397.    Relators re-allege Paragraphs 1 through 396 as though fully set forth herein.

398.    This is a claim for damages and penalties under the North Carolina False Claims Act.

399.    By virtue of the acts described above, Defendant LabCorp knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

400.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the North Carolina State Government to approve or pay such false and fraudulent claims.

401.    By virtue of the acts described above, Defendant conspired with HDL and Singulex to violate the North Carolina False Claims Act.

402.    By virtue of the acts described above, Defendant has violated the North Carolina Anti-Kickback Statute, N.C. Gen. Stat. § 108A-63(g)-(j).

403.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal inducements.

404.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of state and federal funds to North Carolina Medicaid.

85

405.     By reason of the Defendant's acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

406.     The State of North Carolina is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the North Carolina Medicaid program or other state health care programs have sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of North Carolina Gen. Stat. § 1-607(1), (2), (3) and (7).

B.     Twenty five percent (25%) of the proceeds of this action to the Relators if the State of North Carolina elects to intervene, and thirty percent (30%) if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, the costs of the audit, and other related expenses;

D.     Such other relief as the Court deems just and appropriate.

## COUNT IV

### (CALIFORNIA EX REL. LUTZ AND WEBSTER V LABCORP)
### CALIFORNIA FALSE CLAIMS ACT
### Cal. Govt Code §§ 12650 *et seq.*

407.     Relators re-allege Paragraphs 1 through 406 as though fully set forth herein.

408.     This is a claim for treble damages and penalties under the California False Claims Act.

409.     By virtue of the acts described above, Defendant knowingly presented or caused

86

to be presented, false or fraudulent claims to the California State Government for payment or approval.

410.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve or pay such false and fraudulent claims.

411.    By virtue of the acts described above, the Defendant conspired with HDL and Singulex to violate the California False Claims Act.

412.    By virtue of the acts described above, Defendant has violated and continue to violate California laws prohibiting the payment or receipt of bribes or kickbacks, namely Cal Bus. & Prof. Code § 650, Cal. Welfare & Inst. Code § 14107.2, and Cal. Health & Safety Code § 445.

413.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by the Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

414.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of California state funds.

415.    By reason of the Defendant's acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

416.    The State of California is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of California has sustained because of Defendant's actions, plus a civil penalty of $11,000.00 for each violation of Cal. Gov't Code § 12651(a)(1), (2), (3) and (7).

B.    Thirty three percent (33%) of the proceeds of this action to the Relators if the State of California elects to intervene, and fifty percent (50%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT V

### (CALIFORNIA, EX REL. LUTZ AND WEBSTER V LABCORP)
### CALIFORNIA INSURANCE FRAUDS PREVENTION ACT
### Cal. Ins. Code § 1871.7

417.    Relators re-allege Paragraphs 1 through 416 as though fully set forth herein.

418.    This is a claim for treble damages and penalties under the California Insurance Fraud Prevention Act.

419.    By virtue of the acts described above, Defendant knowingly utilized a scheme by which they improperly procured "runners, cappers, steerers, and other persons" to procure patients who held private insurance contracts and against whom Defendant could file claims for payment.  *See* Cal. Ins. Code § 1871.7(a).

420.    Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the private insurers in California, or for patients in California those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

421.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

422.   By virtue of the acts described above, the Defendant conspired with HDL and Singulex to violate the California Insurance Fraud Prevention Act and each patient's private health insurance contract.

423.   The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable as a result of Defendant's illegal conduct.

424.   Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

425.   By reason of Defendant's acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

426.   Each claim for reimbursement that was a result of the Defendant's scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

427.   The State of California is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.   That this Court enter judgment against Defendant in an amount equal to three

times the amount of damages that the private insurance companies have sustained because of Defendant's actions, plus a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation of Cal. Ins. Code § 1871.7(a) and (b);

B.     At least thirty percent (30%) and up to forty percent (40%) of the proceeds of this action to the Relators if the State of California elects to intervene, and forty percent (40%) to fifty percent (50%) if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.     Such other relief as the Court deems just and appropriate.

## COUNT VI

**(COLORADO EX REL. LUTZ AND WEBSTER V LABCORP)**
**COLORADO MEDICAID FALSE CLAIMS ACT**
**Colo. Rev. Stat. Ann. §§ 25.5-4-303.5 *et seq.***

428.     Relators re-allege Paragraphs 1-427 as though fully set forth herein.

429.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

430.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

431.     By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Colorado State Government to approve or pay such false and fraudulent claims.

432.     By virtue of the acts described above, the Defendant conspired to violate the Colorado Medicaid False Claims Act.

90

433. The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

434. Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease its obligations to return overpayments of Colorado state funds.

435. By reason of Defendant's acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

436. The State of Colorado is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Colorado has sustained because of Defendant's actions, plus a civil penalty of $11,000.00 for each violation of Colo. Rev. Stat. Ann. § 25.5-4-305(1)(a), (b), (f) and (g);

B. Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Colorado elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.    Such other relief as the Court deems just and appropriate.

### COUNT VII

**(DELAWARE EX REL. LUTZ AND WEBSTER V LABCORP)**
**DELAWARE FALSE CLAIMS AND REPORTING ACT**
**Del. Code Ann. tit. 6, §§ 1201 *et seq.***

437.    Relators re-allege Paragraph 1-436 as though fully set forth herein.

438.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

439.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

440.    By virtue of the acts by Defendant described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Delaware State Government to approve or pay such false and fraudulent claims.

441.    By virtue of the conduct described herein, Defendant conspired to violate the Delaware False Claims and Reporting Act.

442.    By virtue of the acts described above, Defendant has violated and continue to violate Delaware law prohibiting the payment or receipt of bribes or kickbacks, namely Del. Code Ann. tit. 31, §§ 1005, 1007, and 1008.

443.    The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

444.    Defendant knowingly submitted and/or caused to be made or used false records or

false statements in order to avoid or to decrease the obligations of LabCorp to return overpayments of Delaware state funds.

445.    By reason of Defendant's acts, the State of Delaware has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

446.    The State of Delaware is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of Del. Code Ann. tit. 6 § 1201(a)(1), (2), (3) and (7);

B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Delaware elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT VIII

**(FLORIDA EX REL. LUTZ AND WEBSTER  V LABCORP)**
**FLORIDA FALSE CLAIMS ACT**
**Fla. Stat. Ann. §§ 68.081 *et seq.***

447.    Relators re-allege Paragraphs 1-446 as though fully set forth herein.

448.

448.    This is a claim for treble damages and penalties under the Florida False Claims Act.

449.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

450.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Florida State Government to approve or pay such false and fraudulent claims.

451.    By virtue of the conduct described herein, Defendant conspired to violate the Florida False Claims Act.

452.    By virtue of the acts described above, Defendant has violated and continue to violate Florida law prohibiting the payment or receipt of bribes or kickbacks, namely Fla. Stat. Ann. § 456.054 and Fla. Stat. Ann. § 409.920.

453.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by the Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal inducements.

454.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Florida state funds.

455.    By reason of the Defendant's acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

456.    The State of Florida is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendant.

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the Florida Medicaid or other state health care programs have sustained because of Defendant's actions, plus a civil penalty of $10,000.00 for each violation of Fla. Stat. Ann. § 68.082(2)(a), (b), (c) and (g).

B.    Twenty five percent (25%) of the proceeds of this action if the State of Florida elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, the costs of the audit, and other related expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT IX

**(GEORGIA EX REL. LUTZ AND WEBSTER V LABCORP)**
**GEORGIA STATE FALSE MEDICAID CLAIMS ACT**
**Ga. Code Ann. §§ 49-4-168 *et seq.***

457.    Relators re-allege Paragraphs 1-456 as though fully set forth herein.

95

458.    This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

459.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

460.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Georgia State Government to approve or pay such false and fraudulent claims.

461.    By virtue of the acts described above, Defendant conspired to violate the Georgia State False Medicaid Claims Act.

462.    By virtue of the acts described above, Defendant has violated Georgia's Patient Self-Referral Act, Ga. Code Ann. § 43-1B-4(7).

463.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal inducements.

464.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of state funds to the Georgia Medicaid program.

465.    By reason of the Defendant's acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

466.    The State of Georgia is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by the Defendant.

96

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of Ga. Code Ann. § 49-4-168.1 (a)(1), (2), (3) and (7);

B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Georgia elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT X

### (ILLINOIS EX REL. LUTZ AND WEBSTER V LABCORP)
### ILLINOIS FALSE CLAIMS ACT
### 740 Ill. Comp. Stat. Ann. §§ 175/1 *et seq.*

467.    Relators re-allege Paragraphs 1-466 as though fully set forth herein.

468.    This is a claim for treble damages and penalties under the Illinois False Claims Act.

469.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

470.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Illinois State Government to approve or pay such false and fraudulent claims.

471.     By virtue of the acts described herein, Defendants conspired to violate the Illinois False Claims Act.

472.     By virtue of the acts described above, Defendant has violated and continue to violate 305 Ill. Comp. Stat. Ann. 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks).

473.     The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

474.     Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Illinois state funds.

475.     By reason of Defendant's acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

476.     The State of Illinois is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of

740 Ill. Comp. Stat. Ann. § 175/3(a)(1), (2), (3) and (7);

B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Illinois elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT XI

**(ILLINOIS EX REL. LUTZ AND WEBSTER V LABCORP)**
**ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT**
**740 Ill. Comp. Stat. § 92/1, *et seq.***

477.    Relators re-allege Paragraphs 1 through 476 as though fully set forth herein.

478.    This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act.

479.    By virtue of the acts described above, Defendant knowingly offered and/or paid remuneration to physicians to induce the procurement of patients for Defendant's laboratory testing services for which Defendant could file claims for payment from the patients' insurers. *See* 740 Ill. Comp. Stat. § 92/5(a).

480.    Defendant knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

481.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

482.     By virtue of the acts described above, the Defendant conspired with HDL and Singulex to violate the Illinois Insurance Claims Fraud Prevention Act and each patient's private health insurance contract.

483.     The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendant, paid and continue to pay the claims that are non-payable as a result of Defendant's illegal conduct.

484.     Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

485.     By reason of Defendant's acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

486.     Each claim for reimbursement that was a result of the Defendant's scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

487.     The State of Illinois is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendant.

        **WHEREFORE,** Relators request the following relief:

A.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages that the private insurance companies have sustained because of Defendant's actions, plus a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation of 740 Ill. Comp. Stat. §§ 92/5(a) and (b);

B.     No less than thirty percent (30%) of the proceeds of this action to the Relators if

the State of Illinois elects to intervene, and no less than forty percent (40%) if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.     Such other relief as the Court deems just and appropriate.

## COUNT XII

**(INDIANA EX REL. LUTZ AND WEBSTER V LABCORP)**
**INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT**
**Ind. Code §§ 5-11-5.5-1 *et seq.***

488.     Relators re-allege Paragraphs 1-487 as though fully set forth herein.

489.     This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

490.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

491.     By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Indiana State Government to approve or pay such false and fraudulent claims.

492.     By virtue of the conduct described herein, the Defendant conspired to violate the Indiana False Claims and Whistleblower Protection Act.

493.     By virtue of the acts described above, Defendant knowingly caused or induced another person to perform an act described in Ind. Code § 5-11-5.5-2(b)(1) , (2), (6) and/or (8).

494.     By virtue of the acts described above, Defendant violated and continues to violate Indiana law prohibiting the payment or receipt of bribes or kickbacks, namely Ind. Code § 12-15-24-2.

495.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

496.    By reason of Defendant's acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

497.    The State of Indiana is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant LabCorp.

**WHEREFORE**, Relator requests the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of Ind. Code § 5-11-5.5-2(b)(1), (2), (6), (7) and (8);

B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Indiana elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT XIII

### (IOWA EX REL. LUTZ AND WEBSTER V LABCORP)
### IOWA FALSE CLAIMS ACT
### Iowa Code Ann. §§ 685.1 *et seq.*

498.    Relators re-allege Paragraphs 1-497 as though fully set forth herein.

499.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

500.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

501.    By virtue of the conduct described herein, the Defendant conspired to violate the Iowa False Claims Act.

502.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Iowa State Government to approve or pay such false and fraudulent claims.

503.    By virtue of the acts above, Defendant has violated Iowa regulations against giving kickbacks for referrals, Iowa Admin. Code r. 441-79.2(2)(i).

504.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

505.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations of Defendant LabCorp to return overpayments of Iowa state funds.

506.    By reason of Defendant's acts, the State of Iowa has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

507.     The State of Iowa is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant LabCorp.

**WHEREFORE**, Relators request the following relief:

A.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Iowa has sustained because of Defendant's actions, plus a civil penalty not less than $5,500.00 and not more than $11,000.00 for each violation of Iowa Code Ann. § 685.2(1)(a), (b), (c) and (g);

B.     Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Iowa elects to intervene, and thirty percent (30%) if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.     Such other relief as the Court deems just and appropriate.

## COUNT XIV

**(LOUISIANA EX REL. LUTZ AND WEBSTER V LABCORP)**
**LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW**
**La. Rev. Stat. Ann. §§ 46:437.1 *et seq.***

508.     Relators re-allege Paragraphs 1-507 as though fully set forth herein.

509.     This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

510.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

511.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Louisiana State Government to approve or pay such false and fraudulent claims.

512.    By virtue of the conduct described herein, the Defendant conspired to violate the Louisiana Medical Assistance Programs Integrity Law.

513.    By virtue of the acts described above, the Defendant has violated and continue to violate Louisiana law prohibiting the payment or receipt of bribes or kickbacks, namely La. Rev. Stat. Ann. § 37.1745.

514.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

515.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Louisiana state funds.

516.    By reason of the Defendant's acts, the State of Louisiana has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

517.    The State of Louisiana is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

105

A.      That this court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of La. Rev. Stat. Ann. § 46:438.3(A), (B), (C) and (D);

B.      Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Louisiana elects to intervene, and thirty percent (30%) if it does not;

C.      Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.      Such other relief as the Court deems just and appropriate.

## COUNT XV

**(MICHIGAN EX REL. LUTZ AND WEBSTER V LABCORP)**
**MICHIGAN MEDICAID FALSE CLAIMS ACT**
**Mich. Comp. Laws §§ 400.601 through 400.615**

518.    Relators re-allege Paragraphs 1-517 as though fully set forth herein.

519.    This is a claim for damages and penalties under the Michigan Medicaid False Claims Act.

520.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

521.    By virtue of the acts described above, Defendant knowingly made, used or caused

106

to be made or used false records and statements, and omitted material facts to induce the Michigan State Government to approve or pay such false and fraudulent claims.

522.    By virtue of the conduct described herein, the Defendant conspired to violate the Michigan Medicaid False Claims Act.

523.    By virtue of the acts described above, Defendant has violated and continue to violate Michigan law prohibiting the payment or receipt of bribes or kickbacks, namely Mich. Comp. Laws § 752.1004.

524.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal inducements.

525.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Michigan state funds.

526.    By reason of the Defendant's acts, the State of Michigan has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

527.    The State of Michigan is entitled to restitution and the maximum penalty of $50,000.00 for violations of each of the following provisions: Mich. Comp. Laws §§400.604, 400.606, and 400.607.

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to the amount of damages the State of Michigan has sustained because of Defendant's actions, plus a civil penalty of $50,000.00 for each type of violation

under Mich. Comp. Laws §§400.604, 400.606, and 400.607;

B.    Twenty five percent (25%) of the proceeds of this action if the State of Michigan elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other related expenses;

D.    Such other relief as the Court deems just and appropriate.

## COUNT XVI

**(MINNESOTA EX REL. LUTZ AND WEBSTER V LABCORP)**
**MINNESOTA FALSE CLAIMS ACT**
**Minn. Stat. Ann. §§ 15C.01 *et seq.***

528.    Relators re-allege Paragraphs 1-527 as though fully set forth herein.

529.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

530.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

531.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Minnesota State Government to approve or pay such false and fraudulent claims.

532.    By virtue of the conduct described herein, the Defendant conspired to violate the Minnesota False Claims Act.

108

533.     The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

534.     Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Minnesota state funds.

535.     By reason of Defendant's acts, the State of Minnesota has been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

536.     The State of Minnesota is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Minnesota has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation pursuant to Minn. Stat. Ann. § 15C.02(a)(1), (2), (3) and (7);

B.     Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Minnesota elects to intervene, and thirty percent (30%) if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.      Such other relief as the Court deems just and appropriate.

## COUNT XVII

### (NEW JERSEY EX REL. LUTZ AND WEBSTER V LABCORP)
### NEW JERSEY FALSE CLAIMS ACT
### N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*

537.    Relators re-allege Paragraphs 1-536 as though fully set forth herein.

538.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

539.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

540.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the New Jersey State Government to approve or pay such false and fraudulent claims.

541.    By virtue of the conduct described herein, the Defendant conspired to violate the New Jersey False Claims Act.

542.    By virtue of the acts described above, Defendant has violated and continues to violate the New Jersey Anti-Kickback Statute, N.J. Stat. Ann. § 30:40D-17.

543.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

544.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of New

Jersey state funds.

545.    By reason of Defendant's acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

546.    The State of New Jersey is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE,** Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of N.J. Stat. Ann. § 2A:32C-3(a), (b), (c) and (g);

B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of New Jersey elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.    Such other relief as the Court deems just and appropriate.

## <u>COUNT XVIII</u>

**(NEW YORK EX REL. LUTZ AND WEBSTER V LABCORP)**
**NEW YORK FALSE CLAIMS ACT**
**N.Y. State Fin. Law §§ 187 *et seq.***

547.     Relators re-allege Paragraphs 1-546 as though fully set forth herein.

548.     This is a claim for treble damages and penalties under the New York False Claims

Act.

549.     By virtue of the acts described above, Defendant knowingly presented or caused

to be presented, false or fraudulent claims to the New York State Government for payment or

approval.

550.     By virtue of the acts described above, Defendant knowingly made, used or caused

to be made or used false records and statements, and omitted material facts to induce the New

York State Government to approve or pay such false and fraudulent claims.

551.     By virtue of the conduct described herein, the Defendant conspired to violate the

New York False Claims. Act.

552.     By virtue of the acts described above, Defendant has violated and continues to

violate New York law prohibiting the payment or receipt of bribes or kickbacks, namely N.Y.

Soc. Serv. Law § 366-d.

553.     The New York State Government, unaware of the falsity of the records,

statements and claims made, used, presented or caused to be presented by Defendant, paid and

continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

554.     Defendant knowingly submitted and/or caused to be made or used false records or

false statements in order to avoid or to decrease its obligations to return overpayments of New

York state funds.

555.    By reason of Defendant's acts, the State of New York has been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

556.    The State of New York is entitled to the maximum penalty of $12,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of New York has sustained because of Defendant's actions, plus a civil penalty of not less than $6,000.00 and not more than $12,000.00 for each violation of N.Y. State Fin. Law § 189(1)(a), (b), (c) and (g);

B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of New York elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT XIX

**(TENNESSEE EX REL. LUTZ AND WEBSTER V LABCORP)**
**TENNESSEE MEDICAID FALSE CLAIMS ACT**
**Tenn. Code Ann. §§ 71-5-181 *et seq.***

557.    Relators re-allege Paragraphs 1-556 as though fully set forth herein.

558.     This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

559.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

560.     By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Tennessee State Government to approve or pay such false and fraudulent claims.

561.     By virtue of the conduct described herein, the Defendant conspired to violate the Tennessee Medicaid False Claims Act.

562.     By virtue of the acts described above, Defendant has violated the anti-kickback provisions of the Tennessee Medical Laboratory Act, Tenn. Code Ann. § 68-29-129(7).

563.     The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

564.     Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Tennessee state funds.

565.     By reason of Defendant's acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

566.     The State of Tennessee is entitled to the maximum penalty of $25,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.     That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000.00 and not more than $25,000.00 for each violation of Tenn. Code Ann. § 71-5-182(a)(1)(A), (B), (C) and (D);

B.     Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Tennessee elects to intervene, and thirty percent (30%) if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.     Such other relief as the Court deems just and appropriate.

## COUNT XX

**(TEXAS EX REL. LUTZ AND WEBSTER V LABCORP)**
**TEXAS MEDICAID FRAUD PREVENTION ACT**
**Tex. Hum. Res. Code §§ 36.001 *et seq.***

567.     Relators re-allege Paragraphs 1-566 as though fully set forth herein.

568.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

569.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

115

570.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Texas State Government to approve or pay such false and fraudulent claims.

571.    By virtue of the conduct described herein, the Defendant conspired to violate the Texas Medicaid Fraud Prevention Act.

572.    By virtue of the acts described above, Defendant has violated and continues to violate Texas law prohibiting the payment or receipt of bribes or kickbacks, namely Tex. Occ. Code Ann. § 102.001.

573.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

574.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Texas state funds.

575.    By reason of Defendant's acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

576.    The State of Texas is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendant's

116

actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of Tex. Hum. Res. Code Ann. § 36.002(1), (4), (9), (12);

B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Texas elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.    Such other relief as the Court deems just and appropriate.

## <u>COUNT XXI</u>

**(VIRGINIA EX REL. LUTZ AND WEBSTER V LABCORP)**
**VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**Va. Code Ann. §§ 8.01-216.1 *et seq.***

577.    Relators re-allege Paragraphs 1-576 as though fully set forth herein.

578.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

579.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia for payment or approval.

580.    By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Commonwealth of Virginia to approve or pay such false and fraudulent claims.

117

581.    By virtue of the conduct described herein, the Defendant conspired to violate the Virginia Fraud Against Taxpayers Act.

582.    By virtue of the acts described above, Defendant has violated and continues to violate Virginia law prohibiting the payment or receipt of bribes or kickbacks, namely Va. Code Ann. § 26-20-4 and § 26-20-9.

583.    The Commonwealth of Virginia, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

584.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments to the Commonwealth of Virginia.

585.    By reason of Defendant's acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

586.    The Commonwealth of Virginia is entitled to the maximum penalty of $11,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

WHEREFORE, Relators request the following relief:

A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of Va. Code Ann. § 8.01-216.3(A)(1), (2), (3) and (7);

118

B.     Twenty five percent (25%) of the proceeds of this action to the Relators if the Commonwealth of Virginia elects to intervene, and thirty percent (30%) if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.     Such other relief as the Court deems just and appropriate.

## COUNT XXII
## (WISCONSIN EX REL. LUTZ AND WEBSTER V LABCORP)
## WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT
## Wis. Stat. §§ 20.931 *et seq*.

587.     Relators re-allege Paragraphs 1-586 as though fully set forth herein.

588.     This is a claim for treble damages and penalties under the Wisconsin False Claims Act.

589.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

590.     By virtue of the acts described above, Defendant knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Wisconsin State Government to approve or pay such false and fraudulent claims.

591.     By virtue of the conduct described herein, the Defendant conspired to violate the Wisconsin False Claims for Medical Assistance Act.

592.     By virtue of the acts described above, Defendant has violated and continues to violate Wisconsin law prohibiting the payment or receipt of bribes or kickbacks, namely Wis. Stat. Ann. § 49.49(2).

593.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendant, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal conduct.

594.    Defendant knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease its obligations to return overpayments of Wisconsin state funds.

595.    By reason of Defendant's acts, the State of Wisconsin has been damaged, and continued to be damaged, in a substantial amount to be determined at trial.

596.    The State of Wisconsin is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

**WHEREFORE**, Relators request the following relief:

> A.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500.00 and not more than $10,000.00 for each violation of Wis. Stat. Ann. § 20.931(2)(a), (b), (c) and (g);
>
> B.    Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Wisconsin elects to intervene, and thirty percent (30%) if it does not;
>
> C.    Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.     Such other relief as the Court deems just and

appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *Qui Tam* Plaintiffs hereby

demand a trial by jury.

Respectfully submitted,

WILLIAM J. TUCK, P.A.


s/  William J. Tuck
William J. Tuck, Esquire
U.S.D.C. Bar # 7761
SC Bar # 68365
54 Public Square, P.O. Box 933
Darlington, SC 29540
Tele. No.: (843) 393-2201
Fax:  (843) 393-2216
williamtuckpa@bellsouth.net
Bill@attorneywilliamjtuck.com

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
Marc S. Raspanti, Esquire
 *Admitted Pro Hac Vice*
Michael A. Morse, Esquire
 *Admitted Pro Hac Vice*
Pamela C. Brecht, Esquire
 *Admitted Pro Hac Vice*
PA Bar Nos.: 41350; 80507; 62249
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Tele. No.: (215) 320-6200
Fax:  (215) 981-0082
MSR@Pietragallo.com
MAM@Pietragallo.com
PCB@Pietragallo.com
www.Pietragallo.com

and


WYATT & BLAKE, LLP
James F. Wyatt, III, Esquire
 *Admitted Pro Hac Vice*
Robert A. Blake, Jr., Esquire
 *Admitted Pro Hac Vice*
NC Bar Nos.:  13766; 20858
435 East Morehead Street
Charlotte, NC 28202-2609
Tele. No.: (704) 331-0767
Fax:  (704) 331-0773
jwyatt@wyattlaw.net
rblake@wyattlaw.net

Attorneys for *Qui Tam* Plaintiffs,
Scarlett Lutz and Kayla Webster


Dated:  September 23, 2015

122

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of Plaintiffs/Relators' Severed Third Amended Qui Tam Complaint to be served upon the counsel below via electronic mail and first-class mail:

James Leventis, Esquire
Assistant United States Attorney
United States Attorney's Office
for the District of South Carolina
Wells Fargo Building
1441 Main Street, Suite 500
Columbia, South Carolina 29201
James.Leventi@usdoj.gov

Elizabeth A. Strawn, Esquire
Trial Attorney
United States Department of Justice
601 D Street, NW
Patrick Henry 9138
Washington, DC  20004
Elizabeth.Strawn@usdoj.gov

Jennifer J. Aldrich, Esquire
Assistant United States Attorney
United States Attorney's Office
for the District of South Carolina
1441 Main Street, Suite 500
Columbia, SC 29201
jennifer.aldrich@usdoj.gov

Mary Chris Dobbie, Esquire
Trial Attorney
United States Department of Justice
601 D Street, NW
Patrick Henry 9138
Washington, DC  20004
Mary.chris.dobbie@usdoj.gov

Steven K. McCallister
Assistant Attorney General
Medicaid Investigations Division
Attorney General's Office
North Carolina Department of Justice
5505 Creedmoor Road, Suite 300
Raleigh, NC 27612
SMcCallister@ncdoj.gov

Gene Woo, Esquire
Senior Staff Counsel
California Department of Insurance
300 Capitol Mall, 17th Floor
Sacramento, CA 95814
woog@insurance.ca.gov

Erin Loback, Esquire
Alameda County District Attorney's Office
Medical Fraud Unit
7677 Oakport Street, Suite 650
Oakland, CA 94621
erin.loback@acgov.org

Daniel Gallagher, Esquire
Kent Ray, Esquire
Assistant State's Attorney
Cook County State's Attorney's Office
Richard J. Daley Center
50 West Washington Street, Unit 500
Chicago, IL 60602
Daniel.Gallagher2@cookcountyil.gov
Kent.Ray@cookcountyil.gov

Bettina Stanford, Esquire
Assistant Attorney General
Illinois Attorney General's Office
100 West Randolph Street
Chicago, IL 60601
bstanford@atg.state.il.us

WILLIAM J. TUCK, P.A.


s/  William J. Tuck
William J. Tuck, Esquire
U.S.D.C. Bar # 7761
SC Bar # 68365
54 Public Square, P.O. Box 933
Darlington, SC 29540
Tele. No.: (843) 393-2201
Fax:  (843) 393-2216
williamtuckpa@bellsouth.net
Bill@attorneywilliamjtuck.com


Dated:   September 23, 2015

3003058v1